NOT RECOMMENDED FOR PUBLICATION

File Name: 20a0525n.06

No. 18-2348

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| QUANTUM SAIL DESIGN GROUP, LLC, | ) | |
| | ) | **FILED** |
| Plaintiff-Appellee, | ) | Sep 10, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| JANNIE REUVERS SAILS, LTD., | ) | |
| | ) | |
| Defendant-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| JANNIE REUVERS; BELINDA REUVERS, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Appellants, | ) | |
| and | ) | |
| | ) | |
| LEADING EDGE SAILMAKERS, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

BEFORE: BOGGS, GRIFFIN, and READLER, Circuit Judges.

BOGGS, Circuit Judge. This case is the swan song in an epic saga of unending war over trade secrets and the unlawful sales of sails. Unlike the model of the *Iliad*, it was ended not by men in a horse but by men in robes: This appeal arises out of a district-court summary judgment awarding damages, sanctions, and pre-judgment interest in the amount of $2,521,754.88 to plaintiff Quantum Sail Design Group, LLC ("Quantum") against Jannie Reuvers Sails, Ltd. ("JRS") and Leading Edge Sailmakers, Ltd. ("LES") in an action brought by Quantum for breach

of contract and for breach of the parties' Trade Secret License Agreement. The summary judgment followed five years of litigation that involved appointment of a Master.

The appeal raises three questions: (1) whether the district court failed to perform a *de novo* review of the Master's findings of fact; (2) whether the district court erred by accepting or adopting findings and recommendations that exceeded the scope of the Master's mandate; and (3) whether the district court committed clear error in its own findings of fact. We affirm the district court's judgment.

## I. BACKGROUND

Quantum, a sailmaker company formed in 1996 that conducts business from Traverse City, Michigan, began a year later its cooperation with JRS, another sailmaking company located in Cape Town, South Africa. LES is an affiliate of JRS and is also located in Cape Town, South Africa. In 2004, Quantum started to develop manufacturing technology for the production of advanced membrane sails that are used in sailing competitions.

Quantum licensed JRS to manufacture and sell membrane sails pursuant to an International Affiliate Licensing Agreement ("IALA") and a Trade Secret License Agreement signed in 2005 and 2006, respectively. After JRS had allegedly conducted unreported and unauthorized sales to Quantum's affiliates and customers, the two companies signed a new IALA and Trade Secret License Agreement in 2009. The new agreements resulted in JRS being the only company licensed to both manufacture and sell Quantum sails.

Quantum alleged that unauthorized sales of sails by JRS persisted even after those new licensing and trade secrets agreements were signed. JRS was alleged to have sold Quantum sails outside its licensed territory of South Africa. For example, Quantum alleged that JRS had underbid a Quantum affiliate who had an exclusive license to sell in Italy, that it had sold sails to existing

Quantum customers in the Netherlands, Philippines, and Portugal, and that JRS had also sold Quantum membrane sails to Quantum competitors in the United States and in Australia. Some of the alleged unauthorized sales were conducted by LES.

However, JRS contended that all of its transactions structured under the 2009 agreements turned out to be impermissible under South African law and, specifically, that they violated South African exchange-control regulations. JRS further alleged that it could not comply with the 2009 agreements because other affiliates of Quantum were not informed of or bound by the new terms, including a new price structure, and that Quantum did not have the operational ability and infrastructure in place to implement the terms of the 2009 agreements.

The parties attempted to negotiate an amendment to the 2009 agreements, but no amendment was ever signed. The 2009 agreements expired in February 2011. They were not formally extended or renewed, but Quantum and JRS continued their cooperation regardless, while disagreeing on the terms by which they were bound.

In February 2012, Quantum considered the acquisition of a manufacturing facility in Sri Lanka from Dimension Polyant ("DP"). In October 2012, the owner of JRS approached Quantum with an offer to sell JRS. Three months later, in January 2013, Quantum notified JRS that it would go forward with the purchase of the Sri Lanka manufacturing facility but that it also intended to continue to use the JRS Cape Town facility. In March 2013, JRS terminated its relationship with Quantum, giving 90 days' notice in accordance with the 2009 Trade Secrets License Agreement. Three months later, JRS announced the purchase of an American licensing company, Ullman Sails International ("USI"), a transaction that added new facilities in Cape Town, Durban, and Johannesburg to the business of JRS. JRS then began trading as Ullman Sails.

Quantum alleged that JRS continued to use Quantum's trade secrets in violation of the Trade Secret License Agreement, that it manufactured membrane sails unlawfully under the trade name of Ullman Sails, and that USI had been unable to produce membrane sails prior to joining forces with JRS. Quantum further alleged that, over time, JRS had downloaded from Quantum's servers more than a thousand sail designs, many of which were for sails never built in South Africa, which was JRS's licensing region.

On August 14, 2013, Quantum filed suit in the Western District of Michigan. It sued JRS, LES, Sail Design Company ("SDC"), an alleged affiliate of JRS in Cape Town, South Africa, USI, a California corporation, and Jannie Reuvers, the alleged owner of JRS and USI. The action alleged the following counts: (I) breach of the 2009 International Affiliates Licensee Agreement by JRS; (II) breach of the 2009 Trade Secret License Agreement by JRS; (III) violation of the Michigan Uniform Trade Secrets Act by all defendants; (IV) trademark infringement, unfair competition, and/or false designation of origin against JRS and USI; and (V) statutory theft, embezzlement, and/or conversion against JRS, Reuvers, and USI.

On October 15, 2013, JRS filed its answer and counter-complaint alleging claims for: (I) account stated; (II) common-law conversion; (III) statutory conversion; (IV) declaratory relief; (V) breach of contract; (VI) action for the price pursuant to U.C.C. § 2-709; and (VII) tortious interference with contracts and commercial expectancies.

Defendants USI, SDC, and Reuvers were dismissed for lack of personal jurisdiction. A stipulation and order dismissed Complaint Counts IV and V with prejudice. The district court dismissed Count III of the Complaint with prejudice by granting a motion to narrow the issues, which the court treated as a motion for summary judgment. After the dismissals, two counts of the Complaint remained: Counts I and II (breach of the International Affiliates Licensee

Agreement and breach of the Trade Secret License Agreement). The district court eventually granted Quantum's motion for summary judgment as to those two counts on April 10, 2018.

As for JRS's counterclaims, count III was dismissed with prejudice by stipulation and order. The district court dismissed counts II and VI on motion on April 10, 2018. Counts IV, V and VII were dismissed by stipulation only after JRS was granted on April 10, 2018 summary judgment on count I, account stated, which was the subject of further proceedings detailed below.

On September 1, 2015, the district court entered a stipulated order authorizing appointment of a Master pursuant to Federal Rule of Civil Procedure 53. A stipulated order appointing a Master followed three days later. The Master was authorized to perform an accounting and prepare a written report with recommended findings of fact on two issues: (1) royalties owed by JRS to Quantum under the license agreement, if any (Count I of the Complaint), and (2) the amount Quantum owed JRS on account stated, if any (count I of JRS's counterclaims).

On October 27, 2015, Quantum filed under seal a motion for sanctions, alleging that Jannie and Belinda Reuvers had engaged in discovery violations and that they had submitted a false affidavit and false documents to the Master. The motion was triggered by Quantum's discovery of certain unreported or underreported transactions between LES and Quantum's Norwegian affiliate.

The district court entered on January 29, 2016 an order amending the stipulated order appointing and authorizing the Master, instructing the Master "to determine whether Defendant JRS: (a) properly produced all records pertaining to royalties owed Plaintiff under the 2009 License Agreement; and (b) submitted false invoices to the Master for purposes of the accounting" and, if the Master determined that JRS had engaged in such violations, to "presume that JRS engaged in a similar pattern or practice with regard to all of its other customers without requiring

supporting proof from Plaintiff." The order offered JRS an opportunity to "rebut such presumption by producing evidence that its records for any given customer are true and accurate and reflect legitimate transactions not subject to royalties." Absent such rebuttal, the district court authorized the Master to "adopt any reasonable formula for calculating underreported and unreported transactions subject to royalties based on the evidence presented to the Master." The district court also dismissed Quantum's motion for sanctions as moot.

The Master subsequently conducted proceedings and, on January 30, 2017, issued the Master's Report, which was filed under seal on March 8, 2017. A year later, on April 10, 2018, the district court issued an order with respect to the two remaining counts of the Complaint, Counts I and II (breach of the International Affiliates Licensee Agreement and breach of the Trade Secret License Agreement), which were the subjects of cross-motions for summary judgment. The district court entered judgment for Quantum on both counts. However, the district court reserved its ruling on damages pending findings by the Master. The district court also conditionally granted Quantum's renewed motion with respect to monetary sanctions pending receipt of additional information from Quantum as to the requested amount. In addition, the district court granted summary judgment on count I of JRS's counterclaim, account stated, in the amount of $580,228.55.

The Master's Report set royalties due Quantum at the rates of 8% for transactions with affiliates or conducted as fleet sales and 15% for other transactions within JRS's sales territory. After considering various rates for damages for transactions conducted by JRS outside of its sales territory, including 25%, the Master's Report set damages as a measure of lost profits reflecting mark-up at the rates of 22.5% for transactions with affiliates and 35% for transactions with non-affiliates. The district court ultimately adopted 22.5% as the rate for damages.

Following briefing on the Master's Supplemental Report, the district court entered summary judgment against JRS and LES, awarding Quantum damages, sanctions and pre- and post-judgment interest in the amount of $2,521,754.88 after deducting $580,228 awarded to JRS on count I of its counterclaim. The judgment amount included $312,439 in monetary sanctions imposed against JRS and non-defendants Jannie Reuvers and Belinda Reuvers. The sanctions amount consisted of costs and attorney's fees related to discovery, including payments made by Quantum to the Master. The damages consisted of lost profits based on a 22.5% profit margin, or markup, on sales that had been underreported or not disclosed to Quantum by JRS.

JRS now timely appeals from the summary judgment as to Counts I and II of the Complaint, breach of the International Affiliates Licensee Agreement and breach of the Trade Secret License Agreement. JRS does not appeal the disposition of its counterclaims.

## II.  ANALYSIS

### A.      Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291 over an appeal from the district court's summary judgment. This court reviews *de novo* the district court's grant of summary judgment. *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 894 (6th Cir. 2004). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating the evidence, we draw all reasonable inferences in favor of the non-moving party. *Donald v. Sybra, Inc.*, 667 F.3d 757, 760 (6th Cir. 2012). But a mere scintilla of evidence in support of JRS's position will be insufficient for it to survive summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). There must be enough evidence on which a jury could reasonably find

for JRS. *Ibid*. The inquiry is therefore whether reasonable jurors could find by a preponderance of the evidence that JRS is entitled to a verdict in its favor. *Ibid.*

The Supreme Court, exercising original jurisdiction over controversies between states, treats a Master's findings of fact with "respect and a tacit presumption of correctness" although, in reviewing objections to such factual findings, the Court "assume[s] 'the ultimate responsibility for deciding' all matters." *Kansas v. Nebraska*, 574 U.S. 445, 453 (2015) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 317 (1984)). "A master's findings, to the extent adopted by the court, must be considered the court's findings." Fed. R. Civ. P. 52(a)(4). Further, a district court's "[f]indings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . . ." Fed. R. Civ. P. 52(a)(6). *See also Pullman–Standard v. Swint*, 456 U.S. 273, 287 (1982). But this standard does not apply to conclusions of law, and "if a district court's findings rest on an erroneous view of the law, they may be set aside on that basis." *Pullman–Standard*, 456 U.S. at 287. Therefore, "[w]e review de novo the legal conclusions that underlie a district court's evidentiary ruling." *Rockies Exp. Pipeline LLC v. 4.895 Acres of Land, More or Less*, 734 F.3d 424, 429 (6th Cir. 2013).

"A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 123 (1969). "The authority of an appellate court, when reviewing the findings of a judge a well as those of a jury, is circumscribed by the deference it

must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence." *Ibid*. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574.

**B.      District Court's *De Novo* Review of the Master's Finding of Fact**

JRS alleges that the district court failed to perform a *de novo* review of the Master's findings of facts, and that the judgment should therefore be vacated and the case remanded.

Federal Rule of Civil Procedure 53(f)(1) allows the district court, after giving the parties notice and opportunity to be heard, to "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the [M]aster with instructions" a Master's report. If the parties object to the Master's findings, "[t]he court must decide de novo all *objections* to findings of fact made or recommended by a [M]aster, unless the parties, with the court's approval, stipulate" either that "the findings will be reviewed for clear error," or that the findings of a Master will be final. Fed. R. Civ. P. 53(f)(3) (emphasis added). The court must also "decide de novo all objections to conclusions of law made or recommended by a [M]aster." Fed. R. Civ. P. 53(f)(4). In reviewing objections to a Master's findings of fact, the court extends to the Master's factual findings "respect and a tacit presumption of correctness," but it "conduct[s] an 'independent review of the record,' and assume[s] 'the ultimate responsibility for deciding' all matters." *Kansas v. Nebraska*, 574 U.S. at 453 (quoting *Colorado v. New Mexico*, 467 U.S. at 317) (overruling all objections and adopting the Master's recommendations).

Contrary to the allegations made by JRS on appeal, the district court was not required to perform *de novo* review of the entire Master's Report. Rather, Federal Rule of Civil Procedure 53(f)(3) requires *de novo* review only of objections to the findings of fact included in the Master's Report. JRS and Quantum also did not stipulate to apply the clear error standard of review of the

Master's findings, and they did not stipulate to treat the findings of the Master as final. *See* Fed.

R. Civ. P. 53(f)(3)(A) and (3)(B). Thus, in reviewing the objections *de novo*, the district court was

entitled to rely on the Report's "presumption of correctness." *Kansas*, 574 U.S. at 453.

After the initial Master's Report of January 30, 2017 was issued, JRS filed a brief regarding

the Master's Report. But instead of proposing specific amendments to the Report and stating its

reasons for them, JRS's brief merely described the instances where it disagreed with the Report,

at most proposing to strike or correct certain numerical figures contained in the Report. *See*, e.g.:

> At the behest of the Plaintiff's counsel the report went on to calculate the LE invoices[1] at not just 8% or 15%, but at a "damages" level of 22.5%, totaling $2,287,128.92 (Master's Report, ¶3.1.3). *This figure is calculated by applying 22.5% as the royalty rate of the LE invoices referenced above*. That number is $2,545,690.00. To arrive at the final 22.5% figure of $2,287,128.92 the Master subtracted the TUI adjustment of $258,562.00. *This calculation has no correlation to the express terms of the IALA*. The Master, at the insistence of Plaintiff's counsel, simply upped the royalty percentage as it relates to the LE invoices. The Master goes on to calculate the figure again at 35% ($3,701,402.92). These calculations are called "loss of profit/damages" in the report. It is unclear why this calculation was even made. This Court's orders did not direct the Master to apply these figures, and the Master himself admits that the calculations were done only after speaking with Plaintiff's counsel.
>
> The table on page 131 of the Report *adds* these "lost profits/damages" to the "royalties." (Master's Report, ¶ 5.17.5.) This is incorrect. The 22.5% and 35% figures are just an extension of the 8% and 15% calculations. . . .
>
> This Court can cut through all of this confusion by referring back to the IALA itself and striking the top row of the chart with the 22.5% and 25% figures.[2] The IALA simply does not provide for royalties at these rates and there is certainly no justification for adding these figures to the 8% and 15% figures to arrive at the distorted totals displayed across the bottom row of the table. Under no circumstances should the Court use any of the higher "royalty" rates (22.5%, or 35%). . . . The IALA does not contain royalty rates above 15%. Further, the sales at issue were OEM/fleet sales that provide for a royalty rate of 8%, not a higher figure of 15% that was intended for individual orders.

(alterations in original) (footnotes added).

---

[1] "LE invoices" refer to invoices associated with transactions conducted through LES bank accounts in various currencies.

[2] The initial Master's Report considered a range of rates for calculating damages.

Regarding the high-end assessment of royalty damages in the Master's Report, JRS argued that "[t]his figure is based on the Master's November 16 forensic numbers for the LE invoices at the IALA's royalty rate of eight percent . . . . It's Defendants['] position that there are still outstanding issues that will ultimately lead to the reduction of this figure."

Finally, JRS proposed the following corrections:

> The Master's Report found that the current balance on the open trade account owed to JRS by [Quantum] is $580,228.55. (Master's Report, ¶ 5.7.3). In addition to the unpaid invoices there are Trade Secret fees that [Quantum] improperly deducted from the trade account that total $215,000.00. (Master's Report, ¶ 5.7.6). The fees were taken by [Quantum] for "trade secrets" that JRS never received. Finally, there is an additional $119,000 in fees that [Quantum had] deducted from the amounts due to JRS and paid to [itself]. (Master's Report, ¶ 5.7.7). . . . This figure must be deducted from the high end royalty figure of $1,119,815.25. After the set[-]off the amount owed by JRS to [Quantum] would be *$205,586.70.*

However, JRS also stated in its brief addressing the Master's Report that it intended to file a motion to dismiss based on the determinations in that Master's Report, which implies an acceptance of its findings.

Quantum, on the other hand, clearly noted its objections to the Master's Report in its brief in support of its motion for summary judgment and formally requested six specific modifications to the Master's Report. For example, Quantum addressed the issue of the 22.5% damage rate as follows in its fifth request for modification of the Master's Report:

> However, the Master Exceeded his mandate by recommending which scenario is the correct one. In that regard, Quantum notes that the Master has not articulated why 8% is the appropriate royalty rate rather than 15%. As noted by the Master throughout the report, the 8% rate was only available on OEM transactions and on transactions with TUI Marine.
> If the Court concludes, as a legal matter, that 15% rate is the appropriate rate, Quantum will forego its claim that its lost profits should be measured at its net profit (30.3%) rather than the 22.5% rate. In that scenario (Column 3 in paragraph 5.17.5), the Master's calculations yield a combined royalty/damage figure of $3,056,787 ($2,287,129 plus $1,685,566 minus $915,908).

Quantum then proceeded to list specifically which paragraphs of the Master's report should be stricken or amended.

In its ruling on cross-motions for summary judgment and on plaintiff's motion for sanctions, the district court reviewed the pending requests for modifications. It noted that JRS had failed to provide specific responses to Quantum's requested modifications and amendments. However, the district court stated that it had nevertheless reviewed the parts of the Master's Report to which Quantum requested modifications or amendments, and concluded that Quantum's requests had been proper. The district court then modified the Report accordingly. The district court proceeded to grant Quantum's motion for summary judgment but referred the matter back to the Master for clarification, deferring a ruling on damages pending a response from the Master. The court sought clarification on a number of issues, including some that had been raised by JRS (e.g., "[t]he 22.5% and 35% figures are just an extension of the 8% and 15% calculations. . . ."). The questions resubmitted to the Master by the ensuing district-court order were, in particular:

> (1) whether the calculations in paragraph 5.17.5 of the Report for royalties and damages are based on the same transactions and LE series invoices, i.e., whether the royalty rates (8%, 15%) and the damage rates (22.5% and 35%) are applied to the same or different transactions; and (2) whether the $915,908 identified in paragraph 5.18.1.9 as mark-up that Defendant JRS collected on behalf of Plaintiff was previously credited to Plaintiff or whether such amount must still be deducted to reduce the amount owing to Plaintiff.

In the same opinion, the district court partly granted Quantum's renewed motion for sanctions against JRS and its owners for discovery fraud, including for providing the Master with fabricated invoices and for submitting false affidavits and false information in several filings with the court. The district court denied injunctive relief but granted monetary sanctions in the amount later set at $312,439 in costs and attorney's fees; it also ordered the release to Quantum of $343,636.74 held in escrow in the court's registry. Quantum was required to deposit $339,000 in

escrow as security for payment to JRS of the amount claimed in count I of JRS's countercomplaint, pursuant to an agreement between the parties and an order of the district court granting JRS's motion for entry of a protective order to limit discovery.

JRS now alleges that the district court failed to perform *de novo* review of the Master's finding of facts. But the district court was only required to review *de novo* any objections to the Master's Report. JRS's allegation as to the initial Master's Report fails on procedural grounds, because JRS had not objected to Quantum's proposed amendments to the Report. The district court noted the following regarding JRS's stance on referring disputed matters back to the Master:

> The Court notes that Defendants suggest that the Court refer the Report back to the Master to resolve Quantum's objections. Because it is the Court's responsibility to address objections in the first instance, Defendants' failure to provide specific responses to Quantum's requested modifications provides the Court no basis to conclude that further analysis by the Master on these issues is necessary.

Regardless, the district court proceeded to review Quantum's objections, adopted them, and referred some of the court's *other* questions to the Master for further clarification. The district court also specified the standard under which it reviewed Quantum's requests for modification:

> Pursuant to Federal Rule of Civil Procedure 53(f), a court must decide de novo all objections to a master's findings of fact, unless the parties stipulate for clear error review or that the master's findings will be final. Fed. R. Civ. P. 53(f)(3). Here, the Stipulated Order says that "the Master's findings shall not be final and this Court shall only apply a *de novo* standard of review." (ECF No. 169 at PageID.3080.).

The district court therefore did not fail to review *de novo* objections to the initial Master's Report.

Pursuant to the district court's order, the Master issued its Supplemental Report on May 2, 2018. Both parties filed briefs regarding the Master's Supplemental Report, and neither objected to its findings. Based on the Master's findings on the question submitted to it by the district court, "(1) whether the calculations in paragraph 5.17.5 of the Report for royalties and damages are based

on the same transactions as LE series invoices, i.e., whether the royalty rates (8%, 15%) and the damage rates (22.5% and 35%) are applied to the same or different transactions," the district court concluded that the calculations in ¶ 5.17.5 of the initial Master's Report had amounted to double-counting of LE invoices, and it reduced Quantum's damages accordingly.

The parties disagreed on which rates to choose. The district court rejected JRS's request to return the question to the Master for further inquiry, because JRS had not used prior opportunities to clarify the issues regarding LE invoices, and had, in fact, failed to rebut allegations of discovery fraud as delineated in the Order Amending Stipulated Order Appointing and Authorizing Master Pursuant to Federal Rule 53, triggering the provision of the Order stating that "the Master may adopt any reasonable formula for calculating underreported and unreported transactions subject to royalties based on the evidence presented to the Master." The district court then applied to the disputed amounts the 22.5% damage rate proposed by Quantum. In so doing, the district court did not err by adopting Quantum's proposed rate: "even when the trial judge adopts proposed findings [prepared by a prevailing party] verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson*, 470 U.S. at 572. *See also Kilburn v. United State*s, 938 F.2d 666, 672 (6th Cir. 1991) ("[Plaintiff] next argues that, because the district court adopted the defendant's findings of facts and conclusions of law, we should more closely scrutinize its factual findings. We disagree."); *Wooldridge v. Marlene Indus. Corp*., 875 F.2d 540, 544 (6th Cir. 1989) (finding support for special master's verbatim adoption of a defendant's proposed Findings and Conclusions because "all parties had equal opportunity to submit proposed reports for the special master's consideration and did so").

Consequently, the district court did not fail to review *de novo* any objections to the Master's Supplemental Report either, because neither party had filed such objections.

### C.     The Scope of the Master's Mandate

JRS alleges that the district court improperly accepted or adopted findings and recommendations that exceeded the scope of the Master's mandate.  Specifically, JRS argues that the Order Amending Stipulated Order Appointing and Authorizing Master Pursuant to Federal Rule 53 resulted in an impermissible expansion of the Master's powers, because that order had not been stipulated to by the parties, which violates Federal Rule of Civil Procedure 53.

JRS now appears to argue that, because the order was not stipulated to by the parties, it was also not consented to by the parties, in violation of Federal Rule of Civil Procedure 53(a)(1)(A).  But JRS overlooks the fact that the consent part is merely one of several statutory provisions that define the scope of a Master's appointment.  A court may also appoint a Master to

> hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:
> (i) some exceptional condition; or
> (ii) the need to perform an accounting or resolve a difficult computation of damages . . . .

Fed. R. Civ. P. 53(a)(1)(B).  Here, the appointment of the Master was warranted by the need to perform an accounting and a difficult computation of damages.  For that reason alone, JRS's argument fails.

But JRS further alleges that the scope of the Master's duties was impermissibly expanded by the Order Amending Stipulated Order Appointing and Authorizing Master Pursuant to Federal Rule 53 by directing the Master to investigate charges related to Quantum's allegations of discovery violations by JRS, to wit, "to determine whether Defendant JRS: (a) properly produced all records pertaining to royalties owed Plaintiff under the 2009 License Agreement; and (b) submitted false invoices to the Master for purposes of the accounting" and, if these findings were not rebutted, to "adopt any reasonable formula for calculating underreported and unreported

transactions subject to royalties based on the evidence presented to the Master," which resulted in a calculation of damages.

JRS takes exception to delegating to the Master what JRS considers sanctions-related investigations, even though the factual accounting determinations regarding unreported transactions were, by logical extension, unquestionably within the scope of the Master's stipulated mandate. The stipulated order had directed the Master to conduct findings of fact on two issues: (1) royalties owed by JRS to Quantum under the license agreement, if any (Count I of the Complaint), and (2) the amount Quantum owed JRS on account stated, if any (count I of JRS's counterclaims).

However, the discovery of invoices fabricated by JRS and provided by JRS to the Master, as was submitted in Quantum's repeat motions for sanctions, changed the picture. Consequently, the first stipulated task of the Master, i.e., calculating royalties owed by JRS to Quantum, would not have been feasible without ascertaining which transactions—and in what amounts—were subject to such royalties in the first place. *See Perry Drug Stores v. NP Holding Corp.*, 243 F. App'x 989, 998 (6th Cir. 2007) (per curiam) (holding that the Special Master had the authority to determine defendant's liability for attorney's fees where a stipulated order appointed the Special Master to determine "the issue of [defendant's] liability and damages" and the issue of liability for attorney's fees "clearly pertain[ed] to [defendant's] liability and damages").

JRS further alleges that the Master had acted *ultra vires* in calculating the damages owed by JRS to Quantum. When the district court granted summary judgment to Quantum, it reserved ruling on damages pending findings by the Master. Specifically, the district court ordered:

> [P]ursuant to Fed. R. Civ. P. 53(f)(4), this matter is resubmitted to the Master to address the following issues: (1) whether the calculations in paragraph 5.17.5 of the Report for royalties and damages are based on the same transactions as LE series invoices, i.e., whether the royalty rates (8%, 15%) and the damage rates (22.5% and

35%) are applied to the same or different transactions; and (2) whether the $915,908 identified in paragraph 5.18.1.9 as mark-up that Defendant JRS collected on behalf of Plaintiff was previously credited to Plaintiff or whether such amount must still be deducted to reduce the amount owing to Plaintiff. The Master shall be paid in accordance with the September 4, 2015, Order. (ECF No. 169.).

JRS now alleges that the order defining the scope of Master's duties was never amended to provide for a calculation of damages. However, in its order granting summary judgment, the district court specifically invoked Federal Rule of Civil Procedure 53(f)(4), which states that "[t]he court must decide de novo all objections to conclusions of law made or recommended by a [M]aster." The court therefore did not impose any new duties on the Master, but merely sought certain clarifications while reviewing the Master's conclusions of law. The district court also expressly addressed JRS's objections in its opinion accompanying the order granting motion for summary judgment:

> To the extent Defendants object to the Master's inclusion of calculations of damages based on Quantum's lost mark-ups as beyond the scope of the September 4, 2015, Stipulated Order appointing the Master, the objection is overruled. While it is true that the Stipulated Order confined the Master to determining "royalties" that JRS owes to Quantum, subsequent discoveries, as set forth in Quantum's sanctions motion and described in the Report, rendered such analysis proper, particularly in light of the existing scope of the Master's engagement.

The district court appeared to relate the Master's findings on damages to the provision of the Order Amending Stipulated Order Appointing and Authorizing Master Pursuant to Federal Rule 53, which stated that "the Master may adopt any reasonable formula for calculating underreported and unreported transactions subject to royalties based on the evidence presented to the Master" in case JRS failed to rebut allegations of discovery violations. The rebuttable presumption of discovery violations was phrased as follows:

> 2. In the event the Master determines, based on records of or regarding the Norwegian affiliate, that JRS failed to produce all records pertaining to royalties or submitted false documents or submitted false compilations, such as false sales reports, the Master shall presume that JRS engaged in a similar pattern or practice

with regard to all of its other customers without requiring supporting proof from Plaintiff. JRS may rebut such presumption by producing evidence that its records for any given customer are true and accurate and reflect legitimate transactions not subject to royalties. It is the Master's authority and responsibility to recommend to this Court whether and to what extent the presumption has been rebutted.

3. In the event the Master concludes that JRS engaged in conduct identified in paragraph 1, the Master may adopt any reasonable formula for calculating underreported and unreported transactions subject to royalties based on the evidence presented to the Master.

The district court not only found that JRS had failed to rebut the allegations of discovery violations, but it also sanctioned JRS for these violations. It was therefore not error for the court to trigger the rebuttable presumption provision of its Order Amending Stipulated Order—"the Master may adopt any reasonable formula for calculating underreported and unreported transactions subject to royalties based on the evidence presented to the Master"—and expand it to allow the Master to also determine the damages owed by JRS to Quantum, i.e., Quantum's lost profits, in light of such newly discovered evidence.

For these reasons, the district court did not commit clear error by adopting the Master's findings that were all within the scope of the Master's mandate.

### D.      District Court's Findings of Fact

Finally, JRS alleges that, even if the district court did perform *de novo* review of the Master's reports, and even if the Master's findings were within the scope of his mandate, the district court's findings of fact themselves were clearly erroneous. However, it bears remembering that the district court was not required to perform *de novo* review of the entire Master's Report. It only needed to review specific objections raised by a party. Since neither party had objected to the modified Master's Report, the district court was not required to conduct such *de novo* review of its findings *sua sponte*. *See* Part II.B, *supra*. This is all the more so since the Master's findings were well within the scope of the Master's amended mandate. *See* Part II.C, *supra*.

The main objection of JRS to the district-court findings of fact appears to be a particular methodology of calculating damages in the original Master's Report. JRS contends that the district court erred by incorporating into its ruling a formula proposed by the Master in his original Report that had effectively double-counted amounts for purposes of computing damages and royalties. JRS alleges that, in its Memorandum Order Addressing Outstanding Issues Set Forth in April 10, 2018 Order, the district court, in determining an item of damages calculation referred to as "damages for all non-TUI Marine LE invoices at 22.5%" and set at $1,818,486, used a double-counting formula from the original Master's Report. Specifically, JRS contends that the district court adopted a calculation from a spreadsheet on page 131 of the Master's Report and added the damages, set at 22.5%, on top of the royalties set at 15% for the amounts of the same invoice. JRS then proceeds to elaborate why a formula incorporating such a computation was clearly erroneous.

The problem with that argument is that it lacks a basis in fact: the district court never adopted this specific formula. The calculation of damages had not only already been corrected in the May 2, 2018 Master's Supplemental Report, which was the version of the report adopted by the district court, but it had also been the subject of additional briefings by both parties and of an independent determination by the district court. Neither JRS nor Quantum filed objections to the findings presented in the Master's Supplemental Report.

JRS disregards these subsequent developments of the formula for damages that had occurred since the original Master's Report. JRS even disregards the district court's clarifications on the issue of double-counting in the very order that JRS quotes. When discussing the LE invoices, the district court explained the following in its Memorandum Order Addressing Outstanding Issues Set Forth in April 10, 2018 Order:

> In his Supplemental Report, the Master confirmed that the damage calculations and
> royalty calculations in paragraph 5.17.5 of the original Report were based on the

> same LE invoices, such that an award of damages and royalties based on those invoices would amount to double counting. (ECF No. 234 at PageID.M5000–003.) To better explain his conclusions, the Master amended the schedule set forth in paragraph 5.17.5 of the original Report, which is designated paragraph 2.6 of the Supplemental Report. Given this information, Quantum is entitled to either damages calculated at 25%[3] [sic, should be probably 22.5%] or royalties calculated at 15%, but not both.

(footnote added). The district court further clarified in its order that "on May 2, 2018, the Master issued a Supplemental Report (ECF No. 234) addressing the issues set forth above, and the parties have filed briefs addressing the Supplemental Report." The two issues resubmitted to the Master concerned two questions:

> (1) whether the calculations in paragraph 5.17.5 of the Report for royalties and damages are based on the same transactions as LE series invoices, i.e., whether the royalty rates (8%, 15%) and the damage rates (22.5% and 35%) are applied to the same or different transactions; and (2) whether the $915,908 identified in paragraph 5.18.1.9 as mark-up that Defendant JRS collected on behalf of Plaintiff was previously credited to Plaintiff or whether such amount must still be deducted to reduce the amount owing to Plaintiff.

The resubmitted issues were also helpfully summarized on the very first page of the Memorandum Order that JRS cites for its proposition that the district court double-counted amounts for the purposes of royalties and damages.

> Second, the Court found that paragraph 5.17.5 of the Master's Report was unclear as to whether the calculations for royalties and damages were based on the same transactions and LE invoices. Finally, the Court found the Master's Report unclear as to whether Defendants had previously credited the $915,908 identified in paragraph 5.18.19 as a mark-up or whether that amount should still be deducted to reduce the amount owing to Quantum. The Court resubmitted the matter to the Master to address the latter two issues.

On appeal, JRS raises the issue of double-counting of damages regardless of the fact that the impugned formula for such damages had been subsequently changed by the Master's Supplemental Report—to which report JRS did not object—and had later been clarified by the

---

[3] The district court set the rate of damages at 22.5%.

district court, and then had been subject to additional briefing by both parties before the district court issued its final summary judgment. Therefore, JRS's argument is frivolous in alleging that the district court committed clear error in its determination of damages, claiming that "[t]here is no justification in any of the Master's findings of fact under the 2009 IALA for a 15% royalty rate on LE invoices (many of which were OEM Fleet sales at 8%), *plus* an additional rate of 22.5% on the same sales as damages/lost mark-up calculation." The accuracy of these findings had become a procedurally moot issue long before JRS filed its opening brief in this court.

Finally, JRS appears to be singling out on appeal a single line item in the calculation of damages, to which JRS had also failed to object below. JRS quotes a September 6, 2018 Memorandum Order Addressing Outstanding Issues Set Forth in April 10, 2018 Order to now apparently dispute the amount of "$1,818,486.00 [in] damages for all non-TUI Marine LE invoices at 22.5%." But on October 4, 2018, one month after issuing its Memorandum Order Addressing Outstanding Issues, the district court entered another order giving the parties seven days to object to a proposed final judgment. However, only Quantum filed an objection. It objected to the accounting treatment of the amount released to Quantum from the court's registry. Absent objections raised by JRS, the district court entered judgment for Quantum on October 15, 2018 in the total amount of $2,521,754.88 in damages, monetary sanctions, and pre- and post-judgment interest at the Michigan statutory rate.

Therefore, the district court did not commit clear error in any of its findings of fact.

### III. CONCLUSION

For all the foregoing reasons, we **AFFIRM** the district court's judgment against JRS.