RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0116p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

WOLVERINE PIPE LINE COMPANY,

        *Petitioner*,

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION, Pipeline and Hazardous Materials Safety Administration,

        *Respondent*.

No. 21-3405

On Petition for Review from the United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration.
No. 3-2019-5016.

Argued:  March 10, 2022

Decided and Filed:  June 2, 2023

Before:  BATCHELDER, NALBANDIAN, and READLER, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Joshua S. Johnson, VINSON & ELKINS, LLP, Washington, D.C., for Petitioner. Casen B. Ross, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:**  Joshua S. Johnson, Ronald J. Tenpas, Jeremy C. Marwell, VINSON & ELKINS LLP, Washington, D.C., for Petitioner.  Casen B. Ross, Abby C. Wright, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

     NALBANDIAN, J., delivered the opinion of the court in which READLER, J., joined. BATCHELDER, J. (pp. 19–22), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

NALBANDIAN, Circuit Judge. The Pipeline and Hazardous Materials Safety Administration imposed a civil penalty on Wolverine Pipe Line Company for violating two of its pipeline regulations. Wolverine claims this action was arbitrary and capricious and violated its due process rights. We disagree, and we affirm the agency's decision and deny Wolverine's petition.

I.

A.

*Regulatory Framework.* More than two million miles of pipeline crisscross the United States. These pipelines carry oil, gasoline, and natural gas from state to state, powering American homes, infrastructure, and industry along the way. But with energy reward comes risk. Pipelines can leak, fail, or spill, hurting the environment or wreaking havoc in populated areas. To protect against such risks, Congress enacted a series of pipeline safety laws. *See* 49 U.S.C. §§ 60101 *et seq.* These laws direct the Secretary of Transportation to issue minimum safety standards for pipelines. *Id.* § 60102(a)(2). The Secretary, in turn, delegates this standard-issuing authority to an agency: the Pipeline and Hazardous Materials Safety Administration. *See* 49 C.F.R. § 1.97. The agency, PHMSA for short, has used this authority to issue a host of regulations. Although these regulations are complex, PHMSA's collaborative approach to pipeline safety is simple. That is, the regulations grant pipeline operators flexibility on the front end, but PHMSA approves operators' plans and verifies their regulatory compliance on the back end.

Examples illustrate the point. For instance, pipeline operators retain discretion to develop and implement their own integrity management programs, or IMPs. These IMPs set plans for periodic pipeline assessments, as well as remedial plans for any pipeline repair issues an assessment brings to light. *See generally* 49 C.F.R. § 195.452(b). What's more, in many instances, the regulations allow operators to choose the methodology they will use to conduct

those assessments. By implementing "performance-based standards," the regulations permit operators to choose an assessment method that best fits the needs of their specific pipelines. 65 Fed. Reg. 75,382, 75,388 (Dec. 1, 2000). This front-end flexibility requires back-end verification. To that end, PHMSA approves operators' IMPs and reviews operators' records to check for regulatory compliance.

The regulations here, known as the integrity management regulations, fit this collaborative mold. Taking specific aim at spill prevention in "high consequence areas," these regulations set repair standards for pipelines that transport hazardous liquids. *See* 49 C.F.R. § 195.452(h); PHMSA, *HL IM Performance Measures*, https://www.phmsa.dot.gov/pipeline/ hazardous-liquid-integrity-management/hl-im-performance-measures (last updated Jan. 28, 2020). The standards start with discovery, which "occurs when an operator has adequate information to determine that a condition presenting a potential threat to the integrity of the pipeline exists." 49 C.F.R. § 195.452(h)(2). Under PHMSA's timeline, an operator must discover an integrity issue "promptly, but no later than 180 days" after it receives an assessment that identifies the problem. *Id.*

Post-discovery, PHMSA classifies integrity issues on a spectrum. The higher the risk, the faster an operator must act. In this vein, some especially dangerous repair conditions require immediate repair. If an operator identifies an immediate repair condition—like certain metal loss, a predicted pipe burst—or, as relevant here, a pipeline dent—it "must temporarily reduce the operating pressure or shut down the pipeline until the operator completes the repair of the[] condition[]" to "maintain safety." *Id.* § 195.452(h)(4)(i). Other repairs, like 180-day or 60-day conditions, require less urgent treatment. *Id.* § 195.452(h)(4)(ii)-(iv). Although an operator must complete the repair within a given timeline, it needn't reduce pressure or shut down the pipeline.

With this background in mind, we turn to Wolverine's case.

B.

*Factual Background.* Wolverine transports refined petroleum products in its 700-mile pipeline system. These pipelines run from refineries in the Chicago area to terminals and other

pipelines in and around Indiana and Michigan. Because Wolverine transports refined petroleum, a hazardous liquid, the company falls into PHMSA's regulatory orbit.

A few years ago, PHMSA conducted a routine inspection of Wolverine's records, procedures, and facilities. That inspection identified several issues. So not long after, PHMSA sent Wolverine a Notice of Probable Violation, or a NOPV. The Notice, which acts as an informal charging document for the agency, described nine potential violations of PHMSA's regulations. Only two of those items—"Item 5" and "Item 6"—matter here.

### 1. Item 5

We begin with the events prompting Item 5. An in-line inspection report (ILI report) landed in the inbox of Daniel Cooper, Wolverine's only risk management specialist at the time, on June 10, 2015.[1] But Cooper didn't open the ILI report for another 13 days. Why? On June 10, Cooper was on vacation. And right after, Wolverine sent him on a work trip. Cooper explained that he "did not have access to email" on vacation. (Hr. Tr., A385.) Later, he noted that he "may have seen the e-mail, but [he] did not open the report until [he] got back from [his] travels." (*Id.*) In any event, Cooper eventually returned to the office and read the report on June 23, 2015. The report described a dent with metal loss on the topside of one of Wolverine's pipe segments.

Once Cooper learned about the dent, he sprang into action. First, he reached out to the third-party vendor who prepared the ILI report to confirm that the pipe showed metal loss. After the vendor confirmed, Cooper convened a June 26, 2015 meeting with his Wolverine coworkers. There, they decided to treat the pipeline "anomaly" as a "possible immediate repair." (Hr. Ex. 29, A589.) As Wolverine worked toward a repair, the operator prepared to implement the temporary pressure reduction the regulations require.

---

[1]Pipeline operators typically outsource pipeline assessments to third-party analysts, who prepare ILI reports. These reports give operators a segment-by-segment look at their pipes and identify any integrity issues.

But this pressure reduction never came to pass. Based on an eight-month-old hydrostatic test,[2] Cooper felt "confident" that the dent could withstand any pressure "and was not likely to fail in the next few days."[3] (Hr. Tr., A356.) Besides, in its IMP, Wolverine had interpreted the immediate repair regulation to give it a choice: "[C]omplete" the repair within "up to 5 . . . working days" after an operator determines there is "an immediate repair condition" or "implement a pressure reduction as necessary." (Hr. Ex. 28, A585; Hr. Tr., A351–53.) Relying on its IMP and the recent testing, and using June 26 as the relevant trigger date, Wolverine took the first path. Within four days of the June 26 meeting, Wolverine completed the repair without implementing a temporary pressure reduction.

During the inspection, PHMSA reviewed Wolverine's response and found it lacking. So Item 5 of the Notice cited Wolverine for a violation of the immediate repair regulation, 49 C.F.R. § 195.452(h)(4)(i)(C). Wolverine, PHMSA explained, had "received a final ILI report on June 10, 2015 . . . claimed a discovery date of June 26, 2015 and completed repairs on the pipeline segment on June 30, 2015." (NOPV, A71.) But for the time spanning June 10 to June 30, Wolverine "could not provide a record that a temporary pressure reduction was taken." (*Id.*) Because Wolverine "failed to temporarily reduce the operating pressure," the Notice alleged that Wolverine "committed [a] probable violation[]" of the regulation and recommended a $36,000 penalty. (*Id.* at A68, 71, 74.) And PHMSA's subsequent Violation Report stated that this violation started on June 10, 2015—the date Cooper received, and failed to open, the ILI report.

### 2. *Item 6*

Next, we turn to Item 6. This item dealt with 180-day conditions, rather than immediate repair conditions. One of the 180-day conditions occurs when "[a] calculation of the remaining strength of the pipe shows an operating pressure that is less than the current established

---

[2]"A hydrostatic test is performed by subjecting a pipeline to pressures that exceed its maximum operating pressure, thereby identifying the weakest segments of the pipeline." *ExxonMobil Pipeline Co. v. U.S. Dep't of Transp.*, 867 F.3d 564, 568 n.1 (5th Cir. 2017).

[3]According to Wolverine, the average pressure per square inch at the location of the dent hovered around 200 pounds. About a year earlier, in October 2014, the pipe had withstood 1,700 pounds of pressure per square inch during hydrostatic testing. In Cooper's view, if the pipe withstood 1,700 pounds of pressure per square inch a year earlier, it could withstand 200 pounds of pressure until Wolverine completed the immediate repair.

maximum operating pressure at the location of the anomaly." 49 C.F.R. § 195.452(h)(4)(iii)(D). To calculate the remaining strength, the regulation allows operators to use "suitable" methods, including, but not limited to, two methods called the B31G method and the R-STRENG method. *Id.*

Wolverine received another ILI report identifying four such conditions on June 12, 2015. At each anomaly location, the report calculated the remaining strength of the pipes using both the R-STRENG and the B31G method. But the different methods yielded different results. Under the R-STRENG method, the strength value of each anomaly was *greater* than the maximum operating pressure at that location. But under the B31G method, the strength values were *less* than the maximum operating pressure at the four anomaly locations. So if Wolverine accepted and confirmed the R-STRENG calculations, the four anomalies would not qualify as 180-day conditions. But if it took the other path, relying on B31G instead, they would.

Wolverine took the latter route. With the report in hand, Cooper worked to confirm its contents. But he only recalculated and relied on the B31G values. Indeed, at the agency hearing, Cooper stated he "[n]ormally . . . use[d] [the] B31G [method]" to "prepar[e] repair plans." (Hr. Tr., A429.) Although he doesn't "doubt" the R-STRENG values provided in ILI reports, he doesn't "have all the information necessary to assess [them]," which leads him to "take the more conservative [B31G] approach." (*Id.*)

Wolverine's repair plans confirm Cooper's assessment that Wolverine solely relied on the B31G calculations to classify the four anomalies as 180-day conditions. The plans state that Cooper ran "the modified ASME B31G calculations" and found that four anomalies qualified as 180-day conditions. (JO-KA Repair Plan 10/19/2015, A148–49; JO-KA Repair Plan Summary 10/19/2015, A627.)

With the plans complete, Wolverine started on repairs. For two of the anomalies, the company met the 180-day mark. But at the other two locations, it missed the deadline. PHMSA noted the missed deadlines during its inspection. So in Item 6 of its Notice, PHMSA cited Wolverine for violating the 180-day condition regulation and recommended a $39,200 penalty. In response to the Notice, Wolverine provided a written response that admitted it did not meet

the deadline and assured PHMSA that new procedures were put in place to prevent the violation from happening again.

*Agency Hearing*. After it received the Notice, Wolverine contested PHMSA's accusations. Its defense started with a request for an agency hearing. *See* 49 C.F.R. § 190.211. There, the parties debated the Item 5 and Item 6 violations.

Wolverine's approach to Item 5 emphasized June 26 as the discovery date. To understand why, recall the language of the immediate repair regulation: "To maintain safety, an operator must temporarily reduce the operating pressure or shut down the pipeline until the operator completes the repair." 49 C.F.R. § 195.452(h)(4)(i). In Wolverine's view, this regulation didn't impose a categorical command. Instead, it believed the regulation was most naturally read as *not* requiring the pipeline operator to implement a pressure reduction if the operator could complete the repair quickly. Under that approach, Wolverine contended it didn't violate the regulation. It discovered the repair on June 26 and completed the repair on June 30 "before there was time to effectuate the pressure reduction." (Hr. Tr., A391.)

For Wolverine to win on this theory, it needed PHMSA to accept the June 26 discovery date. So at the hearing, Wolverine went back and forth with PHMSA's investigators about Wolverine's claimed discovery date of June 26. In one such instance, Wolverine's counsel asked one of PHMSA's investigators, Ms. Alexander, about the discovery date. Wolverine's counsel said: "[D]o you dispute that June 26th, 2015, is the date of discovery for this subject condition?" (Hr. Tr., A329.) Alexander answered: "No, I'm not disputing it. That is per Wolverine." (*Id.*) But Wolverine's counsel persisted: "I want to know what you think . . . . Do you have a dispute with June 26th as the discovery date?" (*Id.*) This time, Alexander simply answered: "No." (*Id.*)

This conversation, though, was just one of many instances when the parties argued about discovery for Item 5. At the start, Wolverine's counsel read the Notice to Alexander. Twice counsel asked if the allegation that Wolverine discovered a dent was "the regulatory version of discovery? 49 C.F.R. 195.452(h)(2)." (*Id.* at A326–327.) Alexander confirmed. She also stated: "Wolverine claims a discovery date." (*Id.* at A327.) Later, PHMSA's lawyer, Ms. Stevens, emphasized that June 26th was "Wolverine's date." (*Id.* at A339.) When Wolverine's

counsel retorted that Ms. Alexander "indicated no dispute with that date," Ms. Stevens clarified "there's no dispute that Wolverine stated that date [of June 26]. That's what she's indicating." (*Id.*; *see also id.* at A341 ("Wolverine claimed the discovery date on June 26th.").)

As for Item 6, Wolverine came to the table with a new theory: The repairs weren't 180-day conditions under the regulation. To make its case, Wolverine first pointed out that the regulation included both the R-STRENG and B31G as "[s]uitable remaining strength calculation methods." 49 C.F.R. § 195.452(h)(4)(iii)(D). And under the R-STRENG values, Wolverine contended that the anomalies weren't 180-day conditions. To shore up its argument, it introduced a new chart that incorporated the R-STRENG values from the ILI report. This chart compared the R-STRENG values with the maximum operating pressure at each anomaly, showing that the R-STRENG value was greater than the maximum operating pressure. So if Wolverine had used the R-STRENG values instead of the B31G values, the repairs wouldn't have qualified as 180-day conditions. (Hr. Ex. 33, A626; *see also* Wolverine Post-Hearing Br., A655 (asserting that Wolverine could "have rested on the RSTRENG results and done absolutely nothing").) Still, as one of PHMSA's officers pointed out, Wolverine didn't provide any R-STRENG analysis until October 2019—two years after PHMSA's inspection and four years after it first formulated its repair plans.

*PHMSA's decision*. In the end, Wolverine's arguments at the hearing failed to convince PHMSA. The agency's Final Order found Wolverine liable for violating both the immediate repair and 180-day condition regulations. And although Wolverine petitioned for reconsideration, the agency stayed firm, upholding both its liability findings and its $65,800 fine.

Wolverine now petitions for review of PHMSA's Item 5 and Item 6 decisions, arguing that each was arbitrary and capricious and contrary to law.

## II.

We review PHMSA's action under the Administrative Procedure Act. *See* 49 U.S.C. § 60119(a)(3). Under that Act, we may "set aside" the agency's decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review is deferential. The question is not what we would

have done, nor whether we agree with the agency's action. Rather, the question is whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (explaining that there must be a "rational connection between the facts found and the choice made" (citation omitted)). So long as "the agency's path may reasonably be discerned," we will uphold a decision of even "less than ideal clarity." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citation omitted).

## III.

We consider PHMSA's Item 5 adjudication first. Wolverine contends this decision violated its due process rights and is arbitrary and capricious. PHMSA responds that its conclusion was a textbook application of the immediate repair regulation.

We think PHMSA has the better of the two arguments here. The text of the regulation goes a long way to showing why. "To maintain safety," the regulation tells us, "an operator *must* temporarily reduce the operating pressure or shut down the pipeline until the operator completes the repair of these conditions." 49 C.F.R. § 195.452(h)(4)(i) (emphasis added). In its Item 5 decision, PHMSA simply read the regulation to mean what it says. "[C]lear on its face," the provision informed the regulated community "that, pending repair, an operator must take certain actions." (Reconsideration Decision, A19.) According to PHMSA, this mandate "does not afford operators the ability to defer a pressure reduction . . . if, in their engineering judgment it is simply more convenient to proceed to a repair." (*Id*. at A18.) Put another way, the regulation represents PHMSA's call that "[t]o maintain safety," an operator must reduce pressure pending a repair. 49 C.F.R. § 195.452(h)(4)(i).

This position, long taken by the agency, leaves no room for an operator, like Wolverine, to impose its own judgment. *See, e.g.*, *In the Matter of Centurion Pipeline, LP*, CPF No. 4-2014-5028, 2017 WL 1363408, at *9 (D.O.T. March 30, 2017) (noting that "[i]n prior enforcement proceedings . . . PHMSA has [] determined that § 195.452(h)(4) requires a pressure reduction or a shutdown even if the condition meets immediate repair criteria only after factoring in conservative tool tolerances"); *id.* ("An operator must *immediately* reduce pipeline operating

pressure or shut down a pipeline that has an immediate repair condition." (emphasis added)); *In the Matter of Buckeye Partners, L.P.*, CPF No. 1-2011-5013, 2012 WL 4025918, at *2 (D.O.T. Jul. 27, 2012) ("Pipeline operators are obligated to take immediate action including temporarily reducing operating pressure . . . ."). No matter the discovery date and no matter the speed of the repair, operators must take steps to reduce the pressure or shut down the pipeline.

Wolverine never took these actions. Did it have a dent that met the criteria for an immediate repair? Wolverine admits as much. Did it complete the repair without temporarily reducing the pressure? Wolverine concedes the point. Indeed, during oral argument, Wolverine took the position that whether it opened the letter on June 10 or June 26, it would not have implemented a pressure reduction. In PHMSA's view, these two concessions were enough to find Wolverine liable for violating the regulation.

Wolverine reads the immediate repair regulation differently. It contends that the regulation "cannot reasonably be read to require a pressure reduction or shutdown if the repair can precede those actions." (Wolverine Reply Br. at 10.) "Any alternative interpretation," it suggests, would "require[] a repair to be delayed pending implementation of a pressure reduction or shutdown" and "undermine" the regulation's express "objective of maintaining safety." (*Id.* (citation omitted).) So, the argument goes, operators do not need to reduce pressure or shutdown a pipeline if simply repairing it would be faster.

But Wolverine's reading runs headlong into the regulation's text, which tells operators: "To maintain safety, an operator *must* temporarily reduce operating pressure or shut down the pipeline until the operator completes the repair of th[at] condition." 49 C.F.R. § 195.452(h)(4)(i) (emphasis added). This "prophylactic" directive represents PHMSA's call about the best way to "maintain safety." (PHMSA Br. at 6 ("Immediate repair conditions are those that PHMSA has determined could result in imminent pipeline failure; the agency thus promulgated this prophylactic measure—requiring an operator to reduce or shut down a pipeline's pressure while repairing these conditions—to 'maintain safety' by minimizing strain on the pipeline and decreasing the prospect of imminent failure.").) That we can imagine a scenario where an operator could complete a repair before implementing a pressure reduction is of no moment. The text of the regulation is clear. An operator must implement a pressure

reduction or shut down the pipeline. Wolverine asks us to read an exception into this straightforward directive. We decline to do so.[4]

Wolverine challenges this conclusion on several additional fronts. It starts with two due process arguments and then makes a *Chenery* claim. We consider each in turn.

*Due Process*. Before we address the heart of Wolverine's argument, we begin with a bit of context. The Fifth Amendment's due process clause applies to "administrative proceedings just as it does to other instances of government action." *Karst Robbins Coal Co. v. Dir., Off. of Workers' Comp. Programs*, 969 F.3d 316, 329 (6th Cir. 2020); *see also Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313 (1950).

And in the administrative law context, due process arguments often come in two forms. First, an agency offends due process if it "sustain[s] a charge different from any listed in the complaint," *Hodgins v U.S. Dep't of Agric.*, 238 F.3d 421, 430 (6th Cir. 2000) (table) (citations omitted), or "change[s] theories in midstream without giving [] reasonable notice of the change," *Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 357 (6th Cir. 1992) (citation omitted). And second, even if an agency "properly construe[s]" a regulation, its action might violate due process if "the regulation is so vague in its requirements that its enforcement would violate" the

---

[4]In fact, Wolverine is as likely to fall within its proposed exception as it is to fall outside of it. In other words, it's not clear how long the pressure reduction process would have taken versus the actual repair. This is because, on the record before us, it doesn't seem that Wolverine determined how long it would have taken to reduce pressure. (Hr. Tr., A380 (Cooper indicated Wolverine took some steps to "begin[] the" pressure reduction "process" but didn't know whether Wolverine ever took "further action to actually implement any kind of a pressure reduction" or "what documentation exist[ed]."").) Instead, it seems that Wolverine made a judgment call based on experience. (*Id*. at A354 (Cooper recommended that Wolverine forego a pressure reduction because it could "get in within just a few days and repair [the pipeline]."); *Id*. at A356 (In Cooper's judgment, "if [the] anomaly had survived a 1,700 pound eight-hour test [] it was not likely to fail in the next few days at 50 pounds or maybe 200 pounds.").) Later, the operator posited that it "might have achieved a pressure reduction 'as soon as possible,' and safely so, but never will we know since the repair was effected so quickly." (Wolverine Post-Hearing Br., A662.)

"Never will we know" about sums up the record on this issue. Wolverine can point to no record evidence—other than its own uncorroborated statements to the contrary—that shows it could have completed the repair "before there was time to effectuate a pressure reduction." (Wolverine Br. at 34 (citation omitted).)

Finally, Wolverine is not in a great position to be advocating for an interpretation that is grounded in speediness. Wolverine, after all, received information identifying an immediate repair on June 10 and completed that repair on June 30. During that time, as PHMSA noted, Wolverine took a "lackadaisical approach," failing to even open the report for 13 days. (Reconsideration Decision, A20.) Then, acting on its own, Wolverine found a pressure reduction unnecessary because it could complete the repair quickly. Given the 20 days between receipt of the report and the repair, Wolverine had no excuse for its failure to act.

Fifth Amendment.  *Diebold, Inc. v. Marshall*, 585 F.2d 1327, 1335 (6th Cir. 1978); *see also Ohio Cast Prods., Inc. v. OSHA*, 246 F.3d 791, 798–99 (6th Cir. 2001); Albert C. Lin, *Refining Fair Notice Doctrine: What Notice is Required of Civil Regulations?* 55 Baylor L. Rev. 991, 1001 (2003) (explaining that courts often treat "[w]hether an agency's interpretation is permissible and whether an agency gave adequate notice of that interpretation" as "separate issues").

Wolverine claims that the agency's actions violated both strands of due process doctrine. First, Wolverine contends that PHMSA "violated due process by relying on a novel theory of untimely discovery not adequately alleged" in the Notice.  (Wolverine Br. at 30 (cleaned up).)  In other words, Wolverine argues it lacked fair notice that the agency took issue with its claimed discovery date of June 26. (*Id.* at 37–38.)  Second, Wolverine asserts it lacked fair notice that its conduct would violate the discovery regulation because the regulation's mandate to act "promptly" is unconstitutionally vague.  (*Id.* at 42–43.)

We reject Wolverine's argument that it did not know its claimed discovery date would be at issue in the proceedings.  Wolverine's claimed discovery date played an "ancillary part" throughout the proceedings.  (Reconsideration Decision, A21.)  This is because an operator's "obligation to [reduce pressure] is dictated by when it discovers that it has an immediate repair condition on its pipeline."  (*Id.* at A17.)  And so PHMSA sought to determine when that obligation kicked in.

Right off the bat, PHMSA's informal charging documents put Wolverine on notice that the agency took issue with the operator's timeline.  The Notice began by faulting Wolverine for failing to "temporarily reduce the operating pressure when it discovered a dent."  (NOPV, A71.)  It then added that "Wolverine received a final ILI report on June 10, 2015" but "claimed a discovery date of June 26, 2015 and completed repairs on June 30, 2015."  (*Id.*)  In addition, PHMSA's follow-on Violation Report listed "the [d]ate the violation started" as June 10, 2015. (Violation Report, A112.)  These documents gave Wolverine sufficient warning that PHMSA took issue both with the time between the receipt of the ILI report and the repair and with Wolverine's failure to implement a pressure reduction during that time.  *See ECM BioFilms, Inc. v. FTC*, 851 F.3d 599, 618 (6th Cir. 2017) ("Although the complaint does not define 'reasonably

short period of time' as a specific time period, that level of detail was unnecessary to 'reasonably apprise' [the company] of the issues in controversy.").

Next, Wolverine's own actions confirm that it understood that PHMSA took issue with the time between the receipt of the ILI report and the repair. At the agency hearing, Wolverine tried to pin PHMSA down on the June 26 discovery date. And the parties wrangled over the discovery date multiple times.[5] Also, leading up to this discussion about Wolverine's claimed discovery date, Wolverine had a line of questioning about how quickly operators must reduce pressure when an immediate repair condition is identified.

Again, in its post-hearing recommendation (which Wolverine responded to), PHMSA took issue both with the time between the receipt of the ILI report and the repair and with Wolverine's failure to implement a pressure reduction.

So it is not true that PHMSA shifted its theory from alleging that Wolverine violated the immediate repair regulation by failing *to reduce pressure* to alleging that Wolverine violated the immediate repair regulation by failing *to reduce pressure in a timely fashion*. Timeliness was an "ancillary" issue throughout. (Reconsideration Decision, A21.) And at the end of the day, PHMSA found that Wolverine violated the immediate repair regulation without fixing a discovery date, without charging Wolverine with a discovery regulation violation, *cf. Carlisle Equip. Co. v. Sec'y of Lab. & Occupational Safety*, 24 F.3d 790, 795 (6th Cir. 1994); *Yellow*

---

[5]Wolverine contends that certain exchanges between its counsel and Alexander (a PHMSA investigator) confirmed that PHMSA didn't dispute its claimed discovery date. But viewing the transcript as a whole, it's clear that's not the case. (Hr. Tr., A326–27 (Wolverine Counsel: "[The notice] says that Wolverine discovered a dent. Top line over to the right side. Discovered a dent." Alexander: "I didn't say they discovered a dent. I said Wolverine claims a discovery date." Wolverine Counsel: "We'll come to that in a moment . . . ."); *Id.* at A329 (Wolverine Counsel: "Regarding the statement that Wolverine claimed a discovery date of June 26, 2015, do you dispute that June 26, 2015, is the date of discovery for this subject condition?" Alexander: "No, I'm not disputing it. That is per Wolverine." Later, Wolverine Counsel: "Do you have a dispute with June 26 as the discovery date?" Alexander: "No."); *Id.* at A338–39 (Wolverine Counsel: "Just a couple things inside the violation report . . . . [T]here is a question, the date of violation started and it says what date." Alexander: "It says June 10, 2015." Later, Wolverine Counsel: "Why did you start that on receipt of the ILI report? Earlier you suggested that the action needed to be taken — you didn't suggest. You stated very clearly the actions should occur upon discovery of the condition. What date was that?" PHMSA Counsel: "Wolverine's date. That's what — Wolverine's discovery date was June 26." Wolverine Counsel: "She indicated no dispute with [the 26th]." PHMSA counsel: "Well, there's no dispute that Wolverine stated that date [June 26]. That's what [Alexander's] indicating."); *Id.* at 340–41 (Alexander states that the violation report didn't talk about discovery and she "didn't contest discovery." Wolverine Counsel: "That's right. And the discovery in the NOPV is stated as what date?" Alexander: "Wolverine claimed the discovery date on June 26.").)

*Freight*, 954 F.2d at 355, 358, and without changing its theory of the case, *cf. Bendix Corp. v. FTC*, 450 F.2d 534, 542 (6th Cir. 1971).**6**

*Chenery*. Wolverine next invokes *Chenery I* and *Chenery II*, arguing that PHMSA shifted its reasoning on appeal.  This matters because agency action "cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." *SEC v. Chenery Corp.*, 318 U.S. 80, 95 (1943).  Wolverine points to the fact that, during the agency proceedings, PHMSA acknowledged that discovery played an "ancillary" part of its immediate-repair regulation analysis and spent much time chastising Wolverine for its "lackadaisical approach." (Reconsideration Decision, A20–21.)  But on appeal, PHMSA left out that chastisement, asserting that "any dispute as to when Wolverine discovered the dent that required repair is orthogonal to the regulatory requirement that Wolverine reduce or shutoff the pipeline pressure." (PHMSA Br. at 28.)  Wolverine argues these differences in framing require us to vacate the agency's order below.

We disagree.  Whatever the space between "ancillary" and "orthogonal," it doesn't change our outcome here. *Chenery* "tells us not to sustain an administrative order on a different ground from the one the agency offered." *MISO Transmission Owners v. FERC*, 860 F.3d 837, 843 (6th Cir. 2017); *Chenery Corp.*, 318 U.S. at 94–95; *accord SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  It doesn't keep this Court from upholding an agency action "on the same basis articulated in the order by the agency itself." *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962).  As the Reconsideration Decision held: "This finding of violation is, and always has been, squarely focused on the fact that Wolverine never took a pressure reduction or shut down the pipeline." (Reconsideration Decision, A21.)  And we've explained, the immediate repair regulation tells an operator it "*must* temporarily reduce the operating pressure or shut down the pipeline." 49 C.F.R. § 195.452(h)(4)(i) (emphasis added).  Because Wolverine failed to take either action, PHMSA did not act arbitrarily or capriciously when it determined

---

**6**Because PHMSA's theory of the case did not depend on whether Wolverine violated the discovery regulation, we decline to address Wolverine's argument that the discovery regulation's terms are vague.  To the extent that PHMSA concluded that Wolverine did not act "promptly," as required by the discovery regulation, that is dicta, and we need not address it. (Reconsideration Decision, A18–19.)

Wolverine violated the regulation. This failure formed the core of PHMSA's decision below, and it informs our decision now.

IV.

We turn our attention next to Item 6, which concerns PHMSA's 180-day condition regulation. Because Wolverine's repair of two pipeline anomalies exceeded the 180-day limit, PHMSA found the operator violated the regulation. Wolverine doesn't contest that its repairs stretched past 180 days. Rather, it argues that the anomalies didn't qualify as 180-day conditions in the first place and that PHMSA's contrary conclusion was arbitrary and capricious.

It was not. Far from being "arbitrary and capricious," PHMSA's Item 6 adjudication aligned with its front-end flexibility, back-end verification approach to regulation. On the front end, PHMSA explained that an operator may "run 10,000 different methodologies (provided those methodologies were proven) — as long as it documented its calculations and relied on those calculations to devise an implementation strategy." (Reconsideration Decision, A22.) But on the back end, PHMSA must be able to verify an operator's decision-making during an inspection. This means an operator must "determine what methodologies to use, record its calculations, and present those calculations to inspectors if called upon to justify [its] conduct." (*Id.*)

Wolverine failed to follow these simple steps. A step-by-step walk through the time between its receipt of the ILI report and PHMSA's inspection proves the point. Recall that the report included both R-STRENG and B31G values. But once Wolverine had the ILI report in hand, it only ran, recalculated, and relied on the B31G data. Cooper testified as much at the hearing. (Hr. Tr. at 429 ("Normally in preparing plans, I will use B31G . . . Oftentimes the tool vendors will provide values based on R-STRENG or the effective area method . . . which while I don't doubt those, I don't have all of the information necessary to assess that, so I take the more conservative [B31G] report.").) And Wolverine's repair plans tell a similar tale. They flagged the anomalies as 180-day conditions under B31G. (*See* JO-KA Repair Plan 10/19/2015, A148 (explaining Cooper ran "the modified ASME B31G calculations" and found the four anomalies qualified as 180-day conditions); *see also* Hr. Ex. 35: JO-KA Repair Plan Summary, A627.)

Although the ILI report listed the raw R-STRENG values, Wolverine did nothing with that data. Indeed, during the inspection, Wolverine presented no documents that showed use of the R-STRENG values would lead to a different conclusion. As a result, PHMSA's Notice faulted the operator for missing the 180-day deadline for a few of its repairs. Wolverine admitted as much when it responded. But at the agency hearing, the operator changed its tune. There, Wolverine produced a chart that incorporated the R-STRENG values and showed the anomalies didn't qualify as 180-day conditions under that method. PHMSA weighed this new evidence along with the rest and found Wolverine violated the regulation. "Operators may not," it explained, "rely on one calculation method, devise an implementation strategy and repair plan deadlines, then when presented with an allegation of violation four years later, run different calculation methods." (Reconsideration Decision, A22.)

This decision was neither arbitrary nor capricious. PHMSA "examine[d] the relevant data," including Wolverine's last-minute R-STRENG calculations, and "articulate[d] a satisfactory explanation for its action." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. What's more, when viewed through the lens of PHMSA's collaborative regulatory approach, its decision was reasonable. On the front end, Wolverine received two sets of values: One B31G, the other R-STRENG. Then, it documented, recorded, and relied on only one of those "[s]uitable remaining strength calculation[s]"—the B31G method—to classify the anomalies as 180-day conditions. 49 C.F.R. § 195.452(h)(4)(iii)(D). On the back end, PHMSA assessed Wolverine's own record and determined the operator missed the 180-day deadline. Because that record omitted any R-STRENG calculations or statements that would have shown otherwise, we cannot say PHMSA's decision was arbitrary or capricious.

Wolverine pushes back against this holding in three ways. First, it contends that PHMSA's decision relied on a mistake of fact. To make its case, it points to a single footnote in PHMSA's Reconsideration Decision. It provided: "The evidence presented here is strong—and supports the allegation that the Petitioner solely ran (and relied) on the B31G calculation methodology." (Reconsideration Decision, A23 n.20). Wolverine asserts this statement shows PHMSA erroneously concluded "that the ILI vendor did not provide Wolverine with the R-STRENG values." (Wolverine Br. at 50.) We disagree. Neither the Final Order nor the

Reconsideration Decision assume or find that Wolverine received only B31G values from its ILI vendor. Instead, PHMSA's analysis focused on what Wolverine did with the ILI values. Here, the record shows Wolverine only used, confirmed, and relied on the B31G values during the time leading up to the 2017 inspection. It was only during the 2019 hearing that Wolverine gave PHMSA R-STRENG data suggesting a different result. It follows that PHMSA did not premise its decision on a "factual error." (*Id*. at 49.) Although Wolverine received both R-STRENG and B31G values from the ILI vendor, the record showed it "solely ran (and relied) on the B31G calculation methodology." (Reconsideration Decision, A23 n.20.)

Next, Wolverine asserts that PHMSA's reading of the regulation "cannot be squared with" its "plain language," which says "nothing about holding operators to an 'upfront choice between calculation methods.'" (Wolverine Br. at 51 (quoting Final Order, A7.).) But this argument selectively quotes the record to misstate PHMSA's position. True, PHMSA's Final Order offered: "[W]hile the regulation offers the upfront choice between calculation methods, an operator is held to its choice." (Final Order, A7.) But its Reconsideration Decision elaborated, explaining that an operator could run "10,000 different methodologies" as long as PHMSA could check the work and follow the decision-making process. (Reconsideration Decision, A22.) Contrary to Wolverine's assertions, this position is not "founded on an unsupportable interpretation of" the regulation. (Wolverine Br. at 50.) Rather, like the regulation, it allows operators to use any number of "[s]uitable remaining strength calculation methods" when deciding whether they have a 180-day condition on their hands. 49 C.F.R. § 195.452(h)(4)(iii)(D). Here, Wolverine ran and used one calculation, B31G, to classify its pipeline anomalies as 180-day conditions. PHMSA's decision, which assessed Wolverine's data based on the one calculation it ran, is not contrary to the regulation's text.

Last, Wolverine laments that PHMSA's decision will "deter[] operators from going beyond the regulatory minimum standard of care." (Wolverine Br. at 28.) We do not share its concern. PHMSA only objects to post-hoc rationalizations. As noted above, PHMSA explained that "[i]f Wolverine had evidence that it conducted two (or more) analyses when first making its determinations," the outcome here would change. (Reconsideration Decision, A22–23.) But such evidence must be available during the agency inspection. Any other course, in the

PHMSA's view, would "undermine pipeline safety" by "effectively permit[ting] an operator to avoid regulatory scrutiny by invoking after-the-fact [] methodolog[ies] that PHMSA could not evaluate during routine inspections." (PHMSA Br. at 38, 40.)

Two takeaways follow. First, in the future, a savvy operator should run alternative calculations before, not after, PHMSA knocks at its door. And next, dueling notions of safety and deterrence lie in PHMSA's domain, not ours. So to the extent Wolverine believes another approach would better achieve PHMSA's desired policy outcomes, its argument "is one for resolution by [PHMSA]." *Lake Bldg. Prods., Inc. v. Sec'y of Lab.*, 958 F.3d 501, 506 (6th Cir. 2020).

## V.

For these reasons, we deny Wolverine's petition for review.

————————————

**DISSENT**

————————————

ALICE M. BATCHELDER, Circuit Judge, dissenting.  I believe that Wolverine used sound judgment in compliance with the regulations, whereas the Agency concocted after-the-fact excuses for its contrived rulings.  I refuse to condone the Agency's conduct.

*Item 5*.  On June 25, 2015, Daniel Cooper, Wolverine's Risk and Integrity Specialist, was reading an apparently routine In-Line Inspection (ILI) Report from a contractor and came across a surprising item about the contractor's discovery of a worrisome dent in the pipeline. According to the Report, the contractor had discovered the dent during a regular pipeline assessment back in April, but had not immediately called or emailed Cooper or the local operations engineer to alert Wolverine.  Instead, the contractor just wrote it into the Report and emailed that Report to Wolverine over two months later, on June 10, without any indication of an emergency condition that would require immediate response.  When Cooper read about the dent, however, he immediately called the contractor for confirmation and clarification, called Wolverine personnel working that portion of the pipeline for information, and scheduled a conference call with consultants, contractors, and Wolverine personnel for the next morning, June 26.

Thus, on June 26, Wolverine found that the dent presented an emergency-repair situation. And Wolverine determined that the safest and most expedient means of resolving that potentially hazardous situation was to repair the dent immediately, without the unnecessary delay of shutting off the pipeline and reducing the pressure.  Wolverine completed the repair of the pipeline dent four days later, on June 30, without incident.  By any practical measure, this was a success.

But not according to the Agency.  The Agency fined Wolverine $28,000 for violating certain regulations by failing to shut off the pipeline and reduce the pressure.  During the administrative hearing to adjudicate the violation, Wolverine argued that it discovered the dent on June 26 and promptly repaired it on June 30, in compliance with the regulations.  The Agency

did not dispute that argument at the hearing, but later insisted in its post-hearing briefing that Wolverine discovered the dent on June 10 when its contractor emailed the ILI Report.

In his opinion, the Agency Administrator acknowledged that "Wolverine [had] capably argued that, even when a condition is identified as an immediate repair, a pressure reduction cannot be implemented immediately. There are a number of intervening steps that an operator must take to capably and safely implement a pressure reduction." Therefore, if the discovery date were June 26, then a repair by June 30 meant that Wolverine satisfied the requirement that "[r]epairs must be made as soon as practicable." But the Administrator instead accepted the Agency's post-hearing claim that the discovery date was June 10 and found that "the time that elapsed" between June 10 and June 30 "was too long and did not meet the regulatory standard" for an immediate repair. The Administrator held Wolverine in violation of the regulations and imposed the fine.

There is no honest dispute that Wolverine *actually* discovered the hazard on June 26 and repaired it within days, or whether that was the basis of Wolverine's defense at the hearing. The most that the Agency and its Administrator can contend is that Wolverine *should have* discovered (*constructively* discovered) the existence of the hazard on June 10, when the contractor sent the IRI Report email. While that seems reasonable enough, and fits the Agency's and Administrator's desired outcome in this case, I question whether that is the law. Certainly, the opinion points to no regulation or rule to support that view. In fact, Wolverine might have *constructively* discovered the existence of the dent in April, when its agent (contractor) discovered it, or maybe Wolverine *should have*, with due diligence, discovered it even earlier—I saw nothing in the record to establish how or when the dent actually happened. The point is that the question of when Wolverine should have discovered, or constructively discovered, the dent became the determinative question in the adjudication, but Wolverine was never told that question was at issue and, in fact, was led to believe that it was not. So Wolverine had no opportunity to be heard on the facts or circumstances of that question. I cannot agree that satisfies Wolverine's right to notice and fair hearing.

*Item 6*. In April 2015, in a different part of the pipeline, a Wolverine contractor performing an integrity test pursuant to the regulations, conducted the test twice using two

different methods: once with a method named B31G and once with a method named R-STRENG. Both methods are specifically approved in the regulations. Under the more conservative B31G method, the contractor identified four suspect locations requiring further inspection and repair within 180 days of discovery. Under the more lenient R-STRENG method, however, those same locations passed the testing and required no further investigation. Wolverine could have relied solely on the R-STRENG results and taken no further action at these locations. But it did not. Instead, Wolverine conducted further assessments using B31G, prepared repair plans, and conducted repairs. By any practical measure, this was a commendable approach to pipeline maintenance and safety.

But not to the Agency. The Agency fined Wolverine $37,000 for failing to complete its voluntarily undertaken repairs within 180 days at two of those four locations. Wolverine argued that, because the locations passed the R-STRENG test, there was no 180-day-repair requirement and, therefore, no violation. The Agency answered that the R-STRENG test was irrelevant because Wolverine had elected to use the B31G results to pursue the follow-up assessment and repair.

In rendering his decision, the Administrator added this oddity: "while the regulation offers the upfront choice between calculation methods, an operator is held to its choice of calculation methodology." But the regulations do not require any "choice"—"upfront" or otherwise—nor do the regulations suggest, much less state, anything whatsoever about the operator's being forever "held to that choice." The pertinent regulation says only: "Suitable . . . test methods include, but are not limited to, [] B31G and [] R-STRENG." 49 C.F.R. § 195.452(h)(4)(iii)(D).

This is not an issue of "interpretation"; this is the Agency's adding a requirement (i.e., an upfront choice) that is not contained in the regulation at all. In rejecting Wolverine's motion to reconsider, the Administrator opined that "it would be perfectly permissible for [Wolverine] to run 10,000 different methodologies (provided the methodologies were proven)—as long as it documented its calculations and relied on those calculations to devise an implementation strategy," but Wolverine "may not rely on one calculation method [to conduct proactive, voluntary assessment and repair], then when presented with an allegation of violation years after

the fact, [use those] alternative calculations as a defense." The Administrator does not offer any justification for this ipse dixit proclamation. Nor does he explain why it is appropriate for the Agency to raise "an allegation of violation years after the fact," concerning an operator's voluntary repairs, but inappropriate for the operator to respond to that unexpected allegation by producing the evidence that informed its years-ago decision.

There is no honest dispute that Wolverine tested its pipeline using the R-STRENG, in complete compliance with the regulations, and the pipeline passed the test. At the time, Wolverine also tested the pipeline using B31G and when four locations failed that test, Wolverine proactively and voluntarily undertook a precautionary assessment and repair in full compliance with all regulations. As a practical matter, this was not only appropriate, it was commendable. So, when the Agency showed up four years later imposing a $37,000 fine for Wolverine's failure to complete all of its voluntary repairs within 180 days, why is Wolverine prohibited from demonstrating that the repairs were not required at all, much less within 180 days, based on the R-STRENG results? I cannot agree that satisfies Wolverine's right to notice and a fair opportunity to be heard.

I would vacate the order. Because majority sees it differently, I respectfully dissent.