RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 25a0084p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

APPALACHIAN VOICES; SIERRA CLUB,

                                       *Petitioners*,

    *v.*

UNITED STATES ARMY CORPS OF ENGINEERS, et al.,

                                       *Respondents*,

TENNESSEE GAS PIPELINE COMPANY,

                                       *Intervenor*.

> No. 24-3831

────────────────

On Petition for Review of a Department of Army Permit;
No. LRN-2021-0866.

Argued: December 10, 2024

Decided and Filed: April 4, 2025

Before: MOORE, CLAY, and THAPAR, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Derek O. Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, for Petitioners. Rebecca Jaffe, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. David A. Super, BRACEWELL LLP, Washington, D.C., for Intervenor. **ON BRIEF:** Derek O. Teaney, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, James S. Whitlock, SOUTHERN ENVIRONMENTAL LAW CENTER, Asheville, North Carolina, O.W. "Trey" Bussey, SOUTHERN ENVIRONMENTAL LAW CENTER, Nashville, Tennessee, for Petitioners. Rebecca Jaffe, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. David A. Super, Ann D. Navaro, Kevin A. Ewing, BRACEWELL LLP, Washington, D.C., Scott Burnett Smith, BRADLEY ARANT BOULT CUMMINGS LLP, Huntsville, Alabama, for Intervenor. David D. Ayliffe, TENNESSEE VALLEY AUTHORITY, Knoxville, Tennessee, for Amicus Curiae.

———————————

**OPINION**

———————————

CLAY, Circuit Judge. Appalachian Voices and Sierra Club (collectively "Petitioners") petition for review of Respondent United States Army Corps of Engineers' (the "Corps") decision to issue a permit to Intervenor-Respondent Tennessee Gas Pipeline Company, L.L.C. ("TGP") pursuant to § 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344, for TGP's proposed Cumberland Pipeline (the "Pipeline"). Petitioners, environmental groups with members who live nearby or utilize areas within the Pipeline's proposed path, seek to vacate the § 404 permit, arguing that the Corps violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, in approving TGP's permit application. For the reasons set forth below, we **DENY** the petition for review.

## I. BACKGROUND

TGP's proposed pipeline would transport natural gas across several Tennessee counties along a 32-mile path crossing rocky terrain and more than one hundred bodies of water. The dispute underlying the Petition for Review concerns the Corps' issuance of a permit allowing TGP to discharge certain materials in bodies of water while constructing and operating the Pipeline. Petitioners, who represent individuals who claim they may be negatively impacted by the Pipeline, argue that the Corps failed to comply with federal law in issuing the permit. Respondents disagree with Petitioners' arguments. In the discussion that follows, we assess the parties' arguments and review the laws and facts central to their dispute.

### A. Regulatory Background

Section 404 of the CWA is one of several "interlocking regulation[s] by both federal and state authorities" governing the natural gas industry. *Nw. Cent. Pipeline Corp. v. State Corp. Comm'n of Kansas*, 489 U.S. 493, 506 (1989). Enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," 33 U.S.C. § 1251(a), the CWA is "the principal federal law regulating water pollution in the United States," *Sackett v.*

*Env't Prot. Agency*, 598 U.S. 651, 657–58 (2023). "In order to achieve these goals, § 301(a) of the Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52 (1987) (citing 33 U.S.C. § 1311(a)).

Among those specified sections, § 404 of the CWA authorizes the Corps "to issue permits 'for the discharge of dredged or fill material into the navigable waters at specified disposal sites.'" *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 163 (2001) (citing 33 U.S.C. § 1344(a)).[1] In addition to the § 404 permits, § 402 of the Act establishes the National Pollutant Discharge Elimination System ("NPDES"), which "governs the discharge of pollutants from specific sites, known as point sources . . . and most typically affects industry sources." *Friends of Crystal River v. U.S. Env't Prot. Agency*, 35 F.3d 1073, 1075 (6th Cir. 1994) (citing 33 U.S.C. § 1342).[2] NPDES permits may be issued by the Environmental Protection Agency ("EPA") or states with permitting programs approved by the EPA. *Gwaltney of Smithfield*, 484 U.S. at 52.

Relevant to this appeal, "the CWA establishes one continuous application process to obtain a Section 404 permit, of which state-run permitting programs are one part." *Marquette Cnty. Road Comm'n v. U.S. Env't Prot. Agency*, 726 F. App'x 461, 467 (6th Cir. 2018). Before attaining a § 404 permit, natural gas companies like TGP must first receive a state water quality certification pursuant to § 401 of the CWA. *PUD No. 1 of Jefferson Cnty. v. Wash. Dep't of Ecology*, 511 U.S. 700, 707 (1994). "A Water Quality Certification confirms that a given facility will comply with federal discharge limitations and state water quality standards." *Del. Riverkeeper Network v. Sec'y Pa. Dep't of Env't Prot.*, 833 F.3d 360, 368 & n.14 (3rd Cir. 2016) (citing 33 U.S.C. § 1341(a)(1), (d)). "States may condition [the water quality] certification upon

---

[1]Dredged or fill material "are solids that do not readily wash downstream." *Rapanos v. United States*, 547 U.S. 715, 723 (2006) (plurality opinion).

[2]Point sources are defined in the Act as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include agricultural stormwater discharges and return flows from irrigated agriculture." 33 U.S.C. § 1362(14).

any limitations necessary to ensure compliance with state water quality standards or any other 'appropriate requirement of State law.'" *PUD No. 1*, 511 U.S. at 713–14. States may also, expressly or by silence, waive their authority to issue § 401 water quality certifications by failing to act on a request for certification within a year after receiving the request. *City of Olmsted Falls v. U.S. Env't Prot. Agency*, 435 F.3d 632, 636 (6th Cir. 2006) (citing 33 U.S.C. § 1341(a)(1)). "Accordingly, a state receiving a Section 401 application has four options in total: it may grant a certificate without imposing any additional conditions; grant it with additional conditions; deny it; or waive its right to participate in the process." *Sierra Club v. State Water Control Bd.*, 898 F.3d 383, 388 (4th Cir. 2018).

In addition to the CWA, the Natural Gas Act ("NGA"), 15 U.S.C. § 717 *et seq.*, also governs the natural gas industry. The NGA "was Congress' first attempt to establish nationwide natural gas regulation." *Mobil Oil Expl. & Producing Se. Inc. v. United Distrib. Cos.*, 498 U.S. 211, 215 (1991). Passed in 1938 "to regulate the transportation and sale of natural gas in interstate commerce," the NGA vests the Federal Energy Regulatory Commission ("FERC") "with the authority to . . . approv[e] the construction and extension of interstate pipelines." *PennEast Pipeline Co., LLC v. New Jersey*, 594 U.S. 482, 489 (2021). Pursuant to that authority, a natural gas company like TGP "must obtain from FERC a 'certificate of public convenience and necessity' before it constructs, extends, acquires, or operates any facility for the transportation or sale of natural gas in interstate commerce." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 302 (1988) (quoting 15 U.S.C. § 717f(c)(1)(A)). The certificate "grants its holder the right to acquire through the power of eminent domain any portion of the necessary right-of-way that the holder cannot obtain by contract." *Rockies Exp. Pipeline LLC v. 4.895 Acres of Land*, 734 F.3d 424, 427 (6th Cir. 2013). Before issuing a certificate of public convenience and necessity, "FERC undertakes a review of the environmental impacts of the proposed project," "accept[s] input from the public[,] and then produces an environmental impact statement." *Appalachian Voices v. State Water Control Bd.*, 912 F.3d 746, 750 (4th Cir. 2019) (citing 42 U.S.C. § 4321 *et seq.*; 15 U.S.C. § 717 *et seq.*).

For construction of the Pipeline, TGP received a § 404 permit from the Corps, a § 401 water quality certification from the Tennessee Department of Environment and Conservation

("TDEC")[3], and a certificate of public convenience and necessity from FERC. With the overlapping statutory schemes of each permit and certification in mind, we now turn to the facts underlying the petition. While Petitioners' claims in the instant case concern only the merits of TGP's § 404 permit, given the interplay of the regulatory reviews conducted by the Corps, FERC, and TDEC, where appropriate, we also discuss the facts of TGP's § 401 water quality certification and certificate of public convenience and necessity approval processes.

## B. Factual Background

### 1. TGP's Pipeline Applications

On November 29, 2021, representatives from TGP and Corps staff discussed proposals for the proposed Pipeline's route and the results of surveys conducted to detect wetlands, bodies of water, and animal life in preparation for the Pipeline's construction. Approximately five months later, on May 4, 2022, representatives from TGP met with Corps staff to discuss the status of regulatory approvals for the Pipeline, the Pipeline's path, and the methods TGP intended to use for constructing the Pipeline. Representatives from TGP and Corps staff met again on May 24, 2022, during which they discussed the geological characteristics of the Pipeline's proposed path and various trenching methods that TGP intended to deploy in constructing the Pipeline.

Later that year, on July 22, 2022, TGP applied separately to (i) the Corps for a § 404 permit, (ii) TDEC for a § 401 water quality certification, and (iii) FERC for a certificate of public convenience and necessity. The applications set forth TGP's proposal to construct an approximately 32-mile natural gas pipeline measuring 30 inches in diameter to connect existing TGP gas lines with electric transmissions lines owned and operated by the Tennessee Valley Authority ("TVA"). TGP anticipated primarily utilizing trench excavation methods to construct a path for the Pipeline averaging approximately five feet in depth and 4.5 feet in width. For

---

[3]TDEC is the Tennessee state administrative agency responsible for supervising water quality within Tennessee. *Jones v. City of Lakeland*, 224 F.3d 518, 521 (6th Cir. 2000). In that capacity, TDEC issues Aquatic Resource Alteration Permits ("ARAPs"), which are synonymous with the CWA's § 401 water quality certifications, *see* Tenn. Comp. R. & Reg. 0400-40-07-.04(1), and are required for activities which "alter[] . . . the physical, chemical, radiological, biological, or bacteriological properties" of Tennessee's water, Tenn. Code Ann. § 69-3-108(b)(1).

instances where it encountered bedrock during trenching, TGP offered five rock removal methods, including controlled blasting, to remove the bedrock. TGP proposed first using at least one of the other four methods[4]—to be chosen based "on the relative hardness, fracture susceptibility, and expected volume of the bedrock, as well as its location"—at stream crossings prior to considering the use of controlled blasting to remove bedrock. Individual Permit Appl., ECF No. 27, 805.

The applications also set forth TGP's proposals to cross waterbodies, including ponds and streams, along the Pipeline's path. In total, TGP's proposed Pipeline construction process involved 149 stream crossings and disturbances to two ponds and six wetlands. TGP proposed crossing four streams using three trenchless horizontal directional drill ("HDD") installations and the remaining waterbodies using dry open cut crossing methods. TGP stated its intention to conduct the dry open cut crossing methods "by temporarily diverting stream flow around or through the work area to minimize contact between stream water and excavation and to minimize sediment suspension during trench excavation, pipeline installation, and backfill activities." *Id.* at 787. In contrast, TGP planned to deploy the HDD method at the three specified locations by drilling a small hole at each location from the entry point to the exit point, widening the hole, and pulling the pipeline into position. TGP noted that, compared to other methods, HDD "minimizes the impacts to an area by drilling down and under a sensitive resource, leaving the portion of land in between the entry and exit point relatively undisturbed." *Id.* at 790. TGP explained that HDD would be deployed at four waterbody crossings "to overcome obstacles posed by use of other stream crossing construction methods that are impracticable because of channel dimensions, flow, or other constraints." *Id.*

As an addendum to its applications, TGP submitted a report detailing its efforts to identify and assess waterbodies which may be impacted by the Pipeline. Following a field investigation conducted by TDEC in connection with TGP's water quality certification

---

[4]The other methods are (1) conventional excavation with an excavator; (2) ripping with an excavator equipped with a ripping tooth followed by conventional removal by excavator; (3) hammering with a pointed backhoe attachment or a pneumatic rock hammer, followed by a backhoe excavation; and (4) removal by rock trencher.

application, TGP supplemented the report in written submissions to the Corps on September 30, 2022, and January 27, 2023.

The Corps issued public notices of TGP's § 404 permit application on February 14, 2023, and April 11, 2023. The Corps then provided TGP with the comments that the Corps received in response to the public notices. On August 17, 2023, TGP provided the Corps with responses to the comments, including explanations of its assessment of alternative Pipeline routes and waterbody crossing methods. Before TGP responded to the Corps, FERC issued a Final Environmental Impact Statement ("EIS") for the Pipeline on June 30, 2023. The EIS, which was prepared jointly by FERC, the Corps, and the EPA, concluded that "construction and operation of the [Pipeline] would not result in significant environmental impacts." Final Env't Impact Stmt., ECF No. 31, 98.

### 2. Approvals of Pipeline Construction and Operation

On July 21, 2023, TDEC issued to TGP a § 401 water quality certification. Approximately six months later, on January 18, 2024, FERC issued a certificate of public convenience and necessity for TGP to construct and operate the Pipeline. Then, on April 24, 2024, TDEC issued to TGP a modified ARAP authorizing "temporary impacts to an additional 604 linear feet of stream and permanent impacts to an additional 20 linear feet of stream." Aquatic Res. Alteration Permit NRS 22.192 Modification, ECF No. 27, 318. TDEC explained that "[t]his modification affects only the state aquatic resource alteration permit, and does not constitute a modification of the Section 401 certification issued on July 21, 2023." *Id.* at 338. TDEC further explained that it "ha[d] waived its authority under Section 401 with respect to the new impacts to be authorized by this state permit modification that were not included in the July 21, 2023 section 401 certification." *Id.*

On June 25, 2024, the Corps issued an environmental assessment and statement of findings. The assessment detailed the Corps' review of alternative methods for constructing the Pipeline, including various methods for the Pipeline to traverse waterbodies and displace rocks along the Pipeline's route. Of the alternatives, including one in which the trenchless HDD boring method was used at every crossing, the Corps concluded that TGP's proposed route "is

the least environmentally damaging practicable alternative to meet the project purpose." Env't Assessment, ECF No. 27, 236, 239.

On July 25, 2024, the Corps issued TGP a § 404 permit for the construction and operation of the Pipeline. The permit included "Special Permit Conditions," including several which required TGP to (i) perform Pipeline construction "during low flow and/or dry conditions"; (ii) abide by the terms of TDEC's § 401 water quality certification; (iii) "select the least impactful trenching technique practicable" at each crossing; and (iv) attain the Corps' approval prior to using blasting techniques. Special Permit Conditions, ECF No. 27, 9–10. The following month, TDEC's Division of Water Resources issued to TGP a Notice of Coverage document. The Notice, issued by TDEC pursuant to a General NPDES Permit for Stormwater Discharges Associated with Construction Activities, authorized TGP to discharge stormwater while constructing the Pipeline.

### C. Procedural History

On September 26, 2024, pursuant to Rule 15(a) of the Federal Rules of Appellate Procedure and § 19(d)(1) of the NGA, 15 U.S.C. § 717r(d)(1), Appalachian Voices and Sierra Club timely petitioned this Court for review of the Corps' decision issuing the § 404 permit to TGP. The following week, on October 4, 2024, Petitioners filed an emergency stay motion to stay the Corps' issuance of the § 404 permit pending this Court's review. On October 11, 2024, we granted Petitioners' stay motion and ordered briefing to be expedited in this matter.

## II. DISCUSSION

### A. Standard of Review

The Corps' permitting decisions are subject to review pursuant to the APA. *Ky. Riverkeeper, Inc. v. Rowlette*, 714 F.3d 402, 407 (6th Cir. 2013) (citing *Ky. Waterways All. v. Johnson*, 540 F.3d 466, 473 (6th Cir. 2008)); *see also Olmsted Falls*, 435 F.3d at 636–37 ("Because the Clean Water Act does not articulate its own standard of review, we review agency action pursuant to the Administrative Procedure[] Act."). The APA requires us to review and set aside actions by the Corps which are "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A). Our review in this regard is "extremely narrow." *Oakbrook Land Holdings, LLC v. Comm'r*, 28 F.4th 700, 720 (6th Cir. 2022). We "may not substitute [our] own policy judgment for that of the agency." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Instead, we must "simply ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained [its] decision[s]." *Id.* "Under this deferential 'reasonableness' test, a court cannot set aside an action simply because it would have made a different choice." *Kentucky. v. U.S. Env't Prot. Agency*, 123 F.4th 447, 468 (6th Cir. 2024). Still, we "must ensure that the agency considered each 'important aspect of the problem' and issued a decision rooted in the law and facts." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

Our review of the Corps' adherence to law and facts is necessarily tethered to the Corps' compliance with the statutory and regulatory requirements which govern its consideration of § 404 applications. In reviewing applications for § 404 permits, the Corps must "comply with guidelines promulgated by the [EPA], which are called the § 404(b)(1) Guidelines." *Kentuckians for the Commonwealth v. U.S. Army Corps of Eng'rs*, 746 F.3d 698, 702 (6th Cir. 2014) (citing 33 U.S.C. § 1344(b)(1)). The Guidelines mandate that "no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. § 230.10(a). Alternatives are considered "practicable" when they are "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purpose." *Id.* § 230.10(a)(2). "The Corps and the EPA share responsibility for implementing and enforcing Section 404." *United States v. Cundiff*, 555 F.3d 200, 206 (6th Cir. 2009). "Section 404(b) requires the Corps to consider the environmental consequences of every discharge it allows." *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 269 (2009) (citing 33 U.S.C. § 1344(b)). In addition, the Corps' review "must include 'an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest,' and 'reflect the national concern for both protection and utilization of

important resources.'"  *Kentuckians for the Commonwealth*, 746 F.3d at 703 (quoting 33 C.F.R. § 320.4(a)).

**B.  Analysis**

Petitioners argue that the Corps acted arbitrarily and capriciously in violation of the APA by (i) failing to properly assess the practicability of alternatives to open-cut trenching at waterbody crossings along the Pipeline's route; (ii) failing to determine that TGP's proposed rock-removal methods were the least environmentally damaging practicable alternative; (iii) misconstruing the effect of TDEC's § 401 water quality certification; (iv) improperly relying upon a NPDES permit; and (v) failing to evaluate cumulative effects.  We address each argument in turn.

### 1.  Practicable Alternatives to Open-Cut Trenching

Petitioners argue that the Corps violated the APA by not adhering to the § 404(b)(1) Guidelines' requirement that TGP deploy the least environmentally damaging practicable alternative ("LEDPA") trenching methods in constructing the Pipeline.  Petitioners contend that TGP bore the burden of proving that trenchless construction methods like HDD were impracticable and that the Corps was required to independently verify TGP's assertions concerning the trenchless methods' impracticability.  In Petitioners' view, the Corps erred by not conducting a crossing-by-crossing analysis to determine the LEDPA crossing method at each crossing.  However, Petitioners' contentions are belied by the record evidence and the Corps' reasoned explanation.

For projects like the Pipeline involving "special aquatic sites,"[5] the § 404(b)(1) Guidelines require the Corps to presume the availability of practicable alternatives not involving the special aquatic site "unless clearly demonstrated otherwise."  40 C.F.R. § 230.10(a)(3).  The Guidelines also require the presumption that all discharges not involving the special aquatic site are "less adverse" than discharges into a special aquatic site "unless clearly demonstrated

---

[5]Special aquatic sites "are geographic areas . . . possessing special ecological characteristics of productivity, habitat, wildlife protection, or other important and easily disrupted ecological values."  40 C.F.R. § 230.3(m).  The Corps assumed that each stream crossed by the Pipeline constituted a special aquatic site.

otherwise." *Id.* The Corps determined that TGP rebutted this presumption. In doing so, the Corps assessed the practicability of trenchless crossing methods compared to TGP's proposed open cut methods. The Corps determined that (i) "HDD construction would be disruptive to nearby residents for weeks or months, rather than days"; (ii) "the potential for unintended release of drilling fluids in the geology of the Western Highland Rim" would be "high"; (iii) "[m]uch of the terrain of the Western Highland Rim is not conducive for HDD methods due to slopes at crossing points"; (iv) HDD in this terrain would "create the need for greater drilling pressure, which in turn increases the risk of inadvertent drilling fluid loss"; and (v) "the additional cost and time of construction is not reasonable and is therefore not a practicable alternative." Mem. for Rec., ECF No. 27, 237–38. In addition, the Corps determined that TGP's proposed trenching methods would allow the special aquatic sites' features to "remain intact." Pub. Notice Comments & Responses, ECF No. 27, 299.

In reaching these determinations, the Corps had the benefit of reviewing detailed crossing-specific information in the form of tables providing for the dimensions, substrate type, location, and potential crossing impact of every waterbody within the Pipeline's proposed path. Given that our review here requires us to consider the entire record before the Corps, *see Klein v. U.S. Dep't of Energy*, 753 F.3d 576, 580 (6th Cir. 2014) (citing 5 U.S.C. § 706(2)), and the Corps' reasoned explanations thoroughly assessing that record, we find no reason to substantiate Petitioners' contention that the Corps acted arbitrarily or capriciously in evaluating TGP's proposed waterbody crossing methods.

## 2. Rock-Removal Methods

Petitioners next argue that the Corps violated the APA by abdicating its duty to select the least environmentally damaging practicable rock-removal method at each crossing along the Pipeline's path. Petitioners claim that the Corps "unlawfully empowered TGP to make the regulatory determination—during Pipeline construction—of what non-blasting rock-removal method is the LEDPA." Pet'rs' Br., ECF No. 26, 49. However, Petitioners' claims in this regard fail to account for the role of the rock-removal restrictions imposed on TGP by the Corps in

effecting the Corps' duty to assure that the least environmentally damaging rock removal method is deployed at each crossing.

As explained above, the Corps appended several "Special Permit Conditions" to the § 404 permit it issued to TGP. Among those conditions, Special Condition 9 requires TGP to "select the least impactful trenching technique practicable" and prohibits TGP from utilizing blasting methods without providing written notice to the Corps and receiving the Corps' consent. Special Permit Conditions at 211. Petitioners contend that this enforcement scheme somehow violates the Corps' duties pursuant to the § 404(b)(1) Guidelines. However, we have previously explained that § 404 permits may be "conditioned on future implementation of a mitigation plan compl[iant] with the dictates of the Clean Water Act." *Sierra Club v. Slater*, 120 F.3d 623, 636 (6th Cir. 1997). Accordingly, "the Corps may rely on post-issuance mitigation procedures to minimize environmental impacts." *Ky. Riverkeeper*, 714 F.3d at 413. The Corps reasonably relied on such post-issuance mitigation procedures in the instant case. By instructing TGP to use the "least impactful trenching technique practicable," the Corps effectively conditioned its approval of the § 404 permit on the future implementation of the Guidelines' LEDPA requirement. Given our previous approval of such future implementation schemes, we find no reason now to conclude that the Corps' imposition of such a scheme with regards to rock removal methods violated the APA.

### 3. Scope of TDEC's Water Quality Certification

Petitioners also argue that the Corps violated the APA by improperly relying upon TDEC's § 401 certification to determine that TGP's construction of the Pipeline would be in compliance with applicable water quality standards. In Petitioners' view, the Corps improperly credited TDEC's certification that TGP's construction of the Pipeline would comply with applicable state water quality standards. However, in contrast to Petitioners' contentions, the Corps acted properly in assessing TDEC's water quality certification.

The CWA provides that states should have "a significant role in protecting their own natural resources." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 489 (1987) (citing 33 U.S.C. § 1251(b)); *see also Mountain Valley Pipeline, LLC v. N.C. Dep't of Env't Quality*, 990 F.3d

818, 823 (4th Cir. 2021) ("While the Natural Gas Act 'largely preempts environmental regulation of interstate natural gas pipelines by states,' the statute expressly preserves State authority to regulate pipelines under the Clean Water Act." (quoting *Sierra Club*, 898 F.3d at 388)). In recognition of that role and the principles of federalism which it promotes, the Corps issued a regulation mandating that § 401 water quality certifications finding "compliance with applicable effluent limitations and water quality standards . . . will be considered conclusive." 33 C.F.R. § 320.4(d).

The Corps properly adhered to that rule in accepting TDEC's issuance of the § 401 water quality certification to TGP. Petitioners' invitation to ignore the rule, "in addition to being cumbersome and duplicative of effort, would undermine the role that state environmental agencies play in the Section 401 process." *City of Olmsted Falls*, 435 F.3d at 636 (rejecting contention that the Army Corps of Engineers improperly relied upon a state agency to follow state law when the agency issued a waiver under § 401). Petitioners' position would amount to imposing upon the Corps "a roving mandate to decide that substantive aspects of state-imposed conditions are inconsistent with the terms of § 401." *Am. Rivers, Inc. v. FERC*, 129 F.3d 99, 111 (2d Cir. 1997). Mindful of the federalism principles underlying Congress' requirement that companies like TGP receive a § 401 water quality certification from the State prior to receiving a § 404 permit from the Corps, we decline the Petitioners' invitation to impose such a requirement.

### 4. NPDES Permit

Petitioners next argue that the Corps improperly relied upon a nonexistent NPDES permit to conclude that the Pipeline would have negligible environmental effects. According to Petitioners, the Corps' reliance on this nonexistent permit impermissibly tainted its assessment, and requires that we vacate its order issuing the § 404 permit. However, because the Corps' assessment was amply supported by record evidence, Petitioners' argument on this point fails.

The § 404(b)(1) Guidelines required the Corps to evaluate the Pipeline's impact on suspended particulates and turbidity. *See* 40 C.F.R. § 230.21. In assessing that impact, the Corps stated that a TDEC "NPDES permit" "contain[ing] limits on the amount of total suspended solids" applied to TGP's proposed construction activity. Mem. for Rec. at 242.

Petitioners and Respondents disagree as to whether the Corps could have properly relied upon such a permit and on whether the permit upon which the Corps purported to rely existed at the time the Corps explained its reasoning. However, we do not need to resolve these competing contentions because the Corps properly supported its findings with respect to suspended particulates and turbidity even setting aside its partial reliance on the NPDES permit. In explaining its reasoning, the Corps noted that (i) the potential adverse effects would be minimized by the installation of coffer dams to route the flow of water around trenches; (ii) dry-trench crossings are expected to be completed in one or two days; (iii) best-management practices such as erosion and sedimentation controls would further reduce the potential for turbidity increases; and (iv) TDEC had already determined that any temporary increase in turbidity and total suspended solids would not violate water quality standards or have long term water quality effects. Petitioners' focus on the Corps' statement with respect to the NPDES permit obscures the extent of the reasoning which the Corps offered to support its decision. However, we are not tasked with "flyspeck[ing]" agencies' "environmental analys[es] for any deficiency no matter how minor." *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024) (citation omitted). Our review here is deferential. *Wolverine Pipe Line Co. v. U.S. Dep't of Transp.*, 69 F.4th 365, 372 (6th Cir. 2023). Given that limited level of review, we find that the Corps properly provided support for its suspended particulates and turbidity conclusion.

### 5. Cumulative Effects

Lastly, Petitioners argue that the Corps violated the APA by improperly assessing the potential effects of the Pipeline's construction on water quality. Petitioners assert that the Corps "ignored the cumulative effects of multiple Pipeline crossings on individual streams." Pet'rs' Br. at 26. However, because the Corps did in fact assess cumulative effects in its analysis of the Pipeline, we reject Petitioners' argument.

The § 404(b)(1) Guidelines require the Corps to make certain cumulative effects determinations, including an analysis of "the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill

material."  40 C.F.R. § 230.11(g)(1).  Consistent with that requirement, the Corps undertook a thorough review of the Pipeline's potential impact on water quality.  During that review, the Corps determined that the environmental impacts from the construction would be temporary.  In specifically considering cumulative effects from the Pipeline, the Corps determined that those effects were "not significant," such that "[c]ompensatory mitigation will not be required to offset the impacts of the proposed activity to eliminate or minimize its incremental contribution to cumulative effects."  Mem. for Record at 272.  While Petitioners disagree with this conclusion, they have not posited evidence that the Corps made this determination in error.  We find that the Corps' determination with respect to cumulative effects "may reasonably be discerned." *Ne. Ohio Reg'l Sewer Dist. v. U.S. E.P.A.*, 411 F.3d 726, 734 (6th Cir. 2005).  Accordingly, we reject the Petitioners' argument that the Corps' determination violated the APA.

### III. CONCLUSION

In conclusion, contrary to Petitioners' arguments, the Corps complied with the dictates of the APA in issuing TGP a § 404 permit.  The Corps adequately assessed TGP's permit application and reasonably explained its Pipeline-related decision making with respect to open-cut trenching alternatives, rock removal methodology, the scope of TDEC's § 401 water quality certification, potential impacts on suspended particulates and turbidity, and the cumulative effects of the Pipeline's waterbody crossings.  For the reasons stated above, we **DENY** the petition for review.